The Assistant Vice-Chancellor.
Several of the numerous arguments which were urged against the validity of the mortgages in question, and in behalf of the complainant’s right to some part of the relief sought by his bill, might be passed by in silence, did not the great importance of the interests in controversy,- demand a full and explicit declaration of-the court upon all the questions raised.-
The first point made by the complainant is, that the Merchants’ Exchange Company were not by their charter invested with the power to raise' or borrow money and to give valid securities therefor, and no such power can be implied from the nature of their business, or from the necessity of its exercise.
It is conceded that they could incur a debt binding upon the corporation in the direct and immediate exercise of the power of building an exchange, as for a site, and for labor, materials &c.; but if they could make valid bonds or notes, the evidences of such debts, that must be the limit of their power.
This point brought out a very able and elaborate argument upon the powers and capacities of corporations in general and of this Company in particular; in the course of which some novel doctrines were advanced, especially in reference to the control imposed by the limitation of the amount of its capital-stock.
Every corporation, as such, has the capacity to take and grant property, and to contract obligations in the same manner as an individual.
*289 This is the genera L rule. But corporations are usually created | for some limited and specific purpose, and therefore the general powers incident to a body corporate at common law, are restricted by the nature and object of the institution of each./ And every such corporation has power to make all contracts which are necessary and usual in the course of the busi-ll ness it transacts, as means to enable it to effect such object, unless expressly prohibited by law, or the provisions of its charter.
Upon this principle, and to the extent stated, a corporation in order to attain its legitimate objects, may deal precisely as an individual may who seeks to accomplish the same ends. If chartered for the purpose of building a bridge, it may contract a debt for the labor, the materials, or the land upon which the bridge is abutted. If more advantageous, it mayl borrow money to purchase such land or materials, or to pay | for such labor. And as evidence of the indebtedness and as security for its repayment, it may execute to the creditor a promissory note, a bond or a mortgage ; whether the debt be for the money borrowed, or for the work, materials or land.
The law on this subject is too well settled in this state, tobe questioned or doubted.
In Mott v. Hicks, (1 Cowen’s R. 513,) the Supreme Court decided that the promissory note of a company incorporated for the manufacture of glass, made for wood sold and delivered to the company, was a valid obligation.
In Barker v. The Mechanics’ Insurance Company, (3 Wendell’s R. 96,) the action was upon a promissory note which was averred in the declaration to have been made within the scope of the legitimate purposes of the company. On demurrer, it was objected that the company was incorporated to effect insurances, and therefore could not make notes. The court held that the note was good. They say that there are purposes for which the corporation may have legitimately given a note, as for the rent of their office, for losses on policies, &c.; so that upon the declaration, the court could not say that the note was unauthorized.
Had the note in that case been given for money borrowed to *290 pay the rent of the company, or a loss on a policy of insurance, the decision would have been the same.
In Jackson ex dem. The People of the State of New-York v. Brown, (5 Wendell’s R. 590,) the same court decided that a company incorporated for the purpose of banking, and which, by its charter, was authorized' to purchase, hold and convey such real estate as was requisite for the transaction of its business, or such as had been mortgaged to it by way of security, or conveyed to it in satisfaction of debts previously contracted, &c., had power to mortgage its real estate to secure a debt owing by the corporation. Sutherland, Justice, in delivering the opinion of the court, says that the power of conveying, if not expressly granted, would have resulted from the power of taking lands in satisfaction of debts.
In Moss v. Oakley, (2 Hill’s (N. Y.) Rep. 265,) the same court held that a corporation created for the purpose of mining lead, might make a promissory note for a debt contracted in the course of its legitimate business.
Thus the current of decisions has been uniform in the Supreme Court of this state for the last twenty years, in favor of this power.
In the case of the Attorney General v. The Life and Fire Insurance Company, (9 Paige’s R. 470,) the Chancellor recognized and approved the doctrine of the Supreme Court on this subject.
And in the case of Safford v. Wyckoff, (4 Hill’s R. 442,) in the Court for the Correction of Errors, the same doctrine was reiterated by the Chancellor, and by other members of that court.
And see Willmarth v. Crawford, (10 Wendell’s R. 341.)
In the last revision of our statutes, the legislature thought proper to enact many of the principles of the common law as then understood. And it is accordingly provided in 1 Rev. Stat. 599, 600, § 1, that every corporation as such, has power, among other things, “ to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter.” By the third section, “ In addition to the powers enumerated in the *291 first section of this title, and to those expressly given in its charter, or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers so enumerated and given.”
This is a legislative exposition óf the law, made about five years after the passage of the act incorporating the Merchants’ Exchange Company.
The law is the same in the state of Pennsylvania, as decided by their. Supreme Court. In the case of Gordon v. Preston, (1 Watts’ R. 385,) the company was incorporated for the purpose of'building a permanent bridge over the Susquehannah river. The charter contained this clause: “ And the said company is hereby authorized to purchase in fee, or for any less estate, all such land, tenements and hereditaments, and estate real and personal, as shall be necessary and convenient for them in the prosecution of their work ; and the same to sell and dispose of at their pleasure.” A judgment creditor of the corporation contested the validity of a prior mortgage executed by the Company. The court, per Gibson, Ch. J., said that “ the power to sell included the power to mortgage, as shown by Lancaster v. Dolan, (1 Rawle’s R. 131.) The superadded words, dispose of, leave no doubt of the existence of the intent to give the corporation power to part with their real estate by any voluntary act without regard to the mode of its operation; and as a power to incumber might be necessary to the prosecution of its work, it is not to be doubted that it was intended to be given.”
The authorities relied upon by the complainant’s counsel, do not shake the position which I have advanced. Thus, in the cases of The N. Y. Firemen Insurance Co. v. Sturges, and The Same v. Ely, (2 Cowen’s R. 664 and 678,) the corporation was created for the purposes of insurance, and a clause in their charter enumerated the securities upon which they might loan monies, and it was held that they could not loan upon securities not enumerated. The same was decided in the case of The North River Insurance Company v. Lawrence, (3 Wend. R. 482.) In Beach v. The Fulton Bank, (3 id. 573,) the corporation in question, (The Hudson Insurance Company,) had no *292 power to discount notes, not only by reason of the provisions of its charter, but also because of the prohibition of the restraining law. In the case of The N. Y. Firemen Insurance Co. v. Ely, (5 Conn. R. 560,) the question was upon the same corporation, as in the suit between the same parties reported in 2 Cowen’s Reports, ubi supra, and it was decided that the company had no power to discount promissory notes.
Slark v. Highgate Archway Company, (5 Taunt. 792,) decided nothing except as to the form of contracting; whether a corporation could contract without seal, and whether assumpsit would lie on a note made with the corporate seal.
Dickinson v. Valpy, (10 B. & C. 128; S. C. 5 M. & R. 126,) was the case of a joint stock association or partnership, not a corporation.
The case of Broughton v. The Manchester Water Working Company, (3 B. & A. 8 and 11,) was relied upon as being at variance with the views which I have adopted. There the purpose of the corporation was to supply the inhabitants of a city with water, and it was adjudged that the company had not the power to accept bills of exchange on the ground that such an acceptance came within the provisions of the several prohibitory acts of parliament for the protection of the Bank of England. It is true that Bayley, J., in delivering his opinion, says that no power to contract by bills, notes, <fcc., appears to have been conferred on the company, but he expressly declines passing on the question of power aside from those prohibitory statutes. Best, J., declares that the corporation had not the power to accept bills; but he argued it on the ground that they must contract by their corporate seal, not that they could not contract debts in reference to the subject matter. The other judges who declared their opinions, did not speak on this point; and the decision by the whole court was upon the ground above stated. The case therefore does not conflict with our own decisions, on the extent of the power of corporations to contract.
Having examined some of the usual capacities of a corporation created for a limited purpose or object, I will next inquire with what power it is clothed in regard to real estate.
*293 The Merchants’ Exchange Company is expressly authorized by its charter to take, hold and convey real estate. To what extent it may hold real estate, is fully discussed in a subsequent part of the case.
At common law, a corporation aggregate has an incidental right to dispose of both lands and chattels. Except when restrained by law, all corporations have the absolute jus disponendi, and in its exercise are unlimited as to objects and quantity. (2 Kent’s Commentaries, 281, 2d ed.; Comyn’s Digest, Franchise, F. 11. 18; 1 Kyd on Corp. 108; Angell and Ames on Corp. 125, 2d ed.; Case of Sutton’s Hospital, (10 Reports, 30 b;) The Mayor, &c., of Colchester v. Lowten, (1 Ves. & Beames, 226. 244,) and the arguments at the bar in that case, (pp. 237.240.)
This general right of disposal as to lands, was much circumscribed by the various statutes relative to charitable societies in England; and in this country, where all grants of corporate power emanate from the legislature, it is usual to limit the jus dis ■ ponendi, in religious societies and others of a charitable nature.
Again, a corporation which can dispose of its property, may, in general, dispose of any interest in the same, as it deems expedient ; and in this respect has the same power as an individual. Thus, it is said that it may lease, grant in fee or for life, mort- . gage, and even make an assignment for the benefit of creditors, [ giving preferences, where the law admits of such assignments by natural persons. Angell & Ames on Corp. 126, and the cases there cited. Two of those cases, Jackson v. Brown, (5 Wend. 590,) and Gordon v. Preston, (1 Watts, 385,) I have stated at large, and they establish the power to mortgage.
Such being the general powers and rights of a body corporate, I will next ascertain whether they are in any manner restricted in the case of the Merchants’ Exchange Company.
It is not claimed by the counsel that there is any general statute of this state, which limits or restrains the particular powers involved in the argument. They attempt to deduce those restraints from the source of the Company’s life and being, from the fountain head, the act of incorporation.
*294 The charter certainly does not expressly confer the power to borrow money, or to execute a bond or a mortgage.
But it authorizes the Company to erect and build such edifice or buildings as they may deem necessary or proper, for the purposes of a public exchange for the use of the merchants of the city of New-York. This grant, as we have seen, carries with it as incidental, the exercise of all the means necessary and usual in the case of individuals engaged in similar enterprises. Experience has shown that it is not only usual, but oftentimes necessary for individuals in such cases, to make contracts in a great diversity of forms and objects, and among these, to borrow money and tq give bonds and mortgages to secure its repayment.
Further, this charter provides that the corporation may purchase, and hold and convey, such and so much real estate, as they may deem necessary or proper for the purposes before mentioned. A more ample grant of power in reference to real estate, could scarcely have been penned. It is not merely that they may purchase and hold the requisite land for the Exchange ; but they may purchase what they deem proper. And when purchased, they may convey such and so much of if as they . may deem proper in reference to the objects in view.
Aside from the general principle stated, the cases of Jackson v. Brown, in our Supreme Court, and Gordon v. Preston, in the Supreme Court of Pennsylvania, which I have already cited, are decisive authorities in favor of the existence of the power of this corporation to execute a mortgage to secure" the payment of a debt; and the Pennsylvania decision goes also to the right to incur a debt for the purpose of the erection of the building. In the charter of the Bank of Niagara, which was before the court in Jackson v. Brown, the jus disponendi as to the real estate was expressed in the same language as it is in the act of incorporation before me. The power conferred was, to purchase, hold and convey.
In Gordon v. Preston, there were the additional words, “ dispose of.” But the court declared upon the authority of the previous decision in Lancaster v. Dolan, (1 Rawle, 131,) that the word convey was sufficient to give the power, and they only *295 derived a stronger inference as to the intent of the grant, from the cumulative words, “ dispose of.”
Before leaving this branch of the argument, I ought to observe upon the negative inference against the existence of the power to mortgage, which was drawn by the ingenious counsel for the complainant, from the various statutes which have been enacted in this state from time to time, to enable railroad companies to borrow money, and execute mortgages upon their railways, moveables, and corporate franchises, to secure its payment.
It may be answered in the first place, that there is probably not a single act of incorporation among the thousands which are to be found in our statute book, which does not contain some grant of power, or some restriction, which the corporation thereby created would have taken or been subjected to, if the charter had been silent on the subject. In the charter before me, (and in every other granted before the Revised Statutes, that I recollect to have examined, there are similar provisions,) it is enacted that this body corporate may have continual succession, and be capable in law of suing and being sued, and may have a common seal; all of which rights were conferred by the simple expression, that it was created a body corporate.
Instances of this kind might’ be multiplied to a great extent, but this will suffice to illustrate the argument. The inference from the express grant of the power or right in one charter or act, that the power is not incident to another corporation of a different class, is therefore very feeble.
Another answer to the inference claimed, arises from the peculiar nature of the property of railway companies, which consists mainly of a narrow belt of land, with its superstructures, utterly useless and unavailing for any purpose save that of a railroad. It could not be built upon for dwellings, nor used in agriculture. A mortgage upon a section of a railway, or upon its whole line of road, would make a very defective security. On foreclosure, the mortgagee or purchaser would take the land, without any of the franchises or privileges which belonged to the corporation mortgaging the road, and which make the use of the road profitable.
*296 The special railway acts and provisions to which the counsel referred were designed to obviate this difficulty.
There is still another and a decisive answer to this inference in most of the instances adduced. Take, for example, the first statute referred to, that relative to the Albany and West Stockbridge Railroad Company, passed May 26, 1841. (Laws of New-York, session of 1841, ch. 290, p. 278.)
The section authorizing the company to borrow, was more necessary to enable the city of Albany to make the loan, than to enable the Rail-Road Company to accept of it. And the power to secure it by a mortgage on the property of the company, was necessary to be granted, because that company had not by its charter, any power to convey real estate. It was created subsequent to the Revised Statutes, and was authorized to purchase, take and hold lands necessary and convenient, &c. But the charter was silent as to conveying; and independent of the inference arising from the omission, the power to convey was inconsistent with other provisions of the original and amended charters. (Laws of 1834, ch. 292, p. 539; Laws of 1836, ch. 262, p. 361.)
So in the case of the Long Island Rail-Road Company, the power to convey is not expressly conferred, and is not reconcileable with the section by which the state reserves the right to become vested with the rail-road, its fixtures and appurtenances on payment of the cost to the company, with ten per cent, interest, within fifteen years after the completion of the railway. In the act by which that company was authorized to increase its capital stock, and to mortgage their road, &c., they were restricted in their loans secured by such mortgages, to the amount of their capital paid in.
The charter of the Buffalo and Batavia Rail-Road Company, is similar to that of the Albany and West Stockbridge Rail-Road Company, and open to the same observations.
Many of the charters of the rail-road companies, commented upon by the counsel for the complainant, (and speaking from recollection, without having recently perused them, I may say all of them,) contain a provision reserving to the state the right to purchase their railways, &c., which of itself is inconsistent *297 with the right of either absolute or qualified conveyance of the real estate of such companies.
The inference sought to be derived from these various rail - way acts, is therefore not warranted by them, and does not affect the existence of the power of borrowing and mortgaging in the Merchants’ Exchange Company.
But it was contended on behalf of the complainant, that con - ceding these powers to the Company, the corporation in the execution of these bonds and mortgages, was guilty of a gross abuse and excess of authority in the exercise of such powers, of which the mortgagees in name, as well as those in interest, and the holders of the bonds, had notice; and that the mortgages are for this cause, voidable in this court by the complainant, who is a judgment creditor, and who is injured and impeded in his legal remedy, by the existence and apparent lien of those mortgages.
This point was urged by the counsel for the complainant, with great boldness, ingenuity and learning; but I am not convinced of its truth.
It concedes the power of borrowing, but restricts that power, and the whole lawful expenditure of the corporation, to the amount of its capital, as limited in the charter.
On this hypothesis, the power of borrowing is extinguished, whenever the whole capital is called in.
It was argued that this corporation with a capital of one million, proceeded to lay out the plan of an exchange, which the trustees knew before the work of building it was commenced, would cost far beyond that sum; and when these loans were made and mortgages directed and executed, the trustees were aware that the entire cost would be at least a million and a half, and ultimately they knew it would cost two millions of dollars. That consequently the money was borrowed and the mortgages executed, with the intention on the part of the trustees, either to increase their solid capital to the amount of the cost of the building, as such cost was contemplated when the respective mortgages were given ; or to create a permanent debt to the amount of the mortgages, the principal of which debt *298 they never could pay. In the one case, it is argued that the Company intended to discharge the debt from time to time out of their profits instead of dividing them, and thus when the debt was paid, they would have a solid indivisible capital of nearly two millions of dollars. In the other case, they would have erected an exchange costing that sum, by means of a capital of one million, and of a funded debt of another million, as irredeemable to all intents and purposes as the national debt of Great Britain.
And it is contended that whether their design was to pay the mortgages out of their profits, or never to pay them at all; the effect is the same, and the mortgages are void.
It will be perceived that conceding the alleged excess of power, there are two very important questions, which stand in the way of the complainant’s claim. One is the effect upon the parties who loaned their money upon the faith of these securities, and whether they are chargeable with notice of the excess. And the other is the complainant’s right to moot the point; it being one more appropriate to the interference of the sovereign power of the state. And if a creditor may question it, then further whether the complainant is not, as much as these bond holders, in pari delicto.
But to recur to the principal point, the excess of power.
The argument is founded upon two theories. First, that the real estate which this corporation is entitled to hold, is limited to a million of dollars. Second, that its power of borrowing is limited by the extent of the capital specified in its charter. I will examine these theories in their order.
First. Is the Merchants’ Exchange Company restricted in its real estate to the amount of one million of dollars ? The case before me does not present this point with entire clearness, For although the exchange is shown to have cost nearly two millions of dollars, the most authentic evidence which we have of its actual value makes it worth not more than one million. The gross annual income of the building in December, 1842, was but $48,000, or less than five per cent, n its capital. On this basis, the property could not be valued *299 at more than the capital; and therefore, if the trustees did intend, by means of these mortgages, to make a solid capital of more than a million, it would seem that they signally failed in accomplishing their object.
Let us assume, however, that the exchange is really worth more than a million of dollars, and that the low condition of its rental is owing to temporary causes, and proceed in the inquiry.
Considerable stress was laid upon the form of the words used in the charter—11 The capital stock of the said company or corporation shall not exceed or be more than one million of dollars,” «fee. This expression was undoubtedly used because of the entire uncertainty as to what amount of capital would be requisite to build an exchange; and also, because in the unexampled growth of this city, it was reasonable to anticipate that a capital of a quarter of a million, would build an exchange in 1823, adequate to the wants of the community, while the next generation would require an exchange which a company with a capital of a million would scarcely be able to compass. And this anticipation was partially realized. The first capital required was less than a quarter of a million; but before the building then erected was destroyed, it was found to be loo small; and the present exchange, almost twice as large in its whole extent, and with an exchange-room of twice or three times the dimensions of the room in the former building, is not found to be too large for the existing commerce of the city.
The section limiting the capital, says nothing about the extent of the property which the Company may possess, or which they may own, either real or personal. But the previous section of the charter expressly declares that the Company may hold “ such and so much real estate, and may erect and build such edifice or buildings as they may deem necessary or proper for the purposes herein before mentionedthat is for a public exchange. The usual expression in similar charters granted in that year, was that they might hold such real estate as might be necessary to fulfil the end and intent of the corporation. Bee the numerous cases of turnpike and bridge companies in the *300 Session Laws of 1823. Not that this corporation should be limited to its capital stock, or to any other sum, in accomplishing the great public object in view; an object so much favored, that the legislature provided in the charter itself, that it should be construed benignly and favorably for all beneficial purposes.
There was not even a limitation to so much real estate as the company should in the exercise of their honest judgment, deem necessary, for the purpose of erecting the exchange. But they were enabled to purchase and hold all the real estate which they might deem proper for that purpose. The only limit to the exercise of the judgment of the trustees, which can be derived from this section, is good faith. It is not doubted but that the Company -has proceeded in entire good faith in building the exchange; and upon this section of the act of incorporation, it seems that no other question can be raised.
■ The extreme case put by the counsel, of the Company’s erecting in connection with their exchange room for the merchants, a multitude of offices to be rented out for private uses, (beyond such offices as would be obtained upon the ground which it was necessary or proper to occupy in order to erect such exchange room,) is one of manifest bad faith and infringement of the charter. Sucha procedure would subject the corporation to the action of the Attorney General, and the appropriate remedy.
I am sufficiently conscious of the common law jealousy of conveyances in mortmain, and of the indisposition of our legislature to permit corporations to hold more real estate than is indispensable for the purposes of their institution. But this does not aid me in discovering an intent in the charter in question, to limit the amount of real estate to that of the capital stock. The charter itself, so far as it makes any expression of intention, has given to the Company the most enlarged discretion on the subject. And contemporary legislation abundantly proves, that this was not the result of accident or negligence.
Not to travel beyond the same session of the legislature at which this act became a law ; we find statutes incorporating banks, insurance companies, turnpike, canal and bridge companies, gas and manufacturing companies, and a great variety *301 of literary, charitable and other eleemosynary institutions; in all of which are contained some provision respecting the holding of real estate. In the latter class of corporations, in which there is usually no capital stock, the real estate which they may respectively hold, is either restricted to a gross sum, or limited in the amount of their annual income, as is the case with our general statutes relative to the incorporation of literary and religious societies, by the voluntary action of individuals who choose to associate together for that purpose. Thus in the act incorporating the Central Society for the instruction of the deaf and dumb, (Laws of 1823, ch. 189,) the amount of both real and personal estate which the society may hold, is limited to a specific sum. While in the act incorporating the Fire Department in the city of Brooklyn, (ibid, ch. 177,) the limit is imposed upon the annual income. So of the Albany Lyceum and the Troy Savings Bank, chartered the same year.
In the numerous class of canal, bridge and turnpike companies of that year, the real estate is in various forms of language, restricted to such as may be necessary to effect the objects of the corporation. I will note two or three singular exceptions. In the charter of the Niagara Canal Company, (ibid. ch. 133,) it is provided that the amount of the real estate which the corporation shall be entitled to hold, shall not at the time of acquiring the same, exceed the sum of ten thousand dollars in value, over and above the real estate necessary to effect the objects of the corporation. There the capital stock was to be §120,0U0, and the property of the corporation, almost exclusively real estate.
In the charter of the Unadilla Bridge Company, (ibid. ch. 242,) it is expressly provided" that the whole estate of the corporation shall not exceed a specified sum, which sum corresponds with the capital stock.
In the act incorporating the New-York and Sharon Canal Company, (ibid. ch. 190,) the capital stock is made to “consist of such sum or sums of money as may be found necessary to carry into complete effect the entire objects of their incorporation, and shall be divided into shares of one hundred dollars each,” &c. Besides which there is- the usual power to take the necessary real estate for the purpose.
*302 In one of the charters of the year 1823, the particular real estate is described, which the corporation is authorized to hold. So in that of the Chemical Manufacturing Company, which also had banking powers, (ibid. ch. 46,) certain real estate was specified, and they were entitled in addition, to purchase such other as was necessary for their manufactory.
The banks and insurance companies were restricted to such real estate as was requisite for their offices, and such as they might acquire for precedent debts. The Phcenix Fire Insurance Company and the Equitable Insurance Company, were each restricted to §15,000 in the real estate, which they might hold for their offices. (Ibid. ch. 95 and 234.)
The New-York Gas Light Company, (ibid. ch. 85,) were enabled to hold such real estate as should be necessary to give effect to the purposes of the incorporation, or for the accommodation of their business or concerns, provided the value of such real estate should not exceed §100,000; and their capital stock should not exceed one million of dollars.
On the other hand, the Oswego Canal Company (ibid. ch. 241,) were not restricted at all in reference to the real estate which they might acquire, except that they were prohibited from erecting any hydraulic works upon or near their canal.
These various statutes of the year 1823, creating private corporations aggregate, show conclusively to my mind, that the legislature, in the charter of the Merchants’ Exchange Company, did not intend to limit the value of their real estate to the amount of their capital stock; or to impose any other limit in that behalf, except the exercise of the good faith of the trustees, as to the extent of the real estate proper for the purposes of a public exchange. The Revised Statutes (1 R. S. 600, § 1, subd. 4, and § 3,) were referred to, as either directly limiting the power of this corporation as to the extent of their property ; or at least, as a legislative declaration of the extent to which that power was originally granted. As to the former, it may be doubted whether the subject was within the control of subsequent legislation. The People v. The Manhattan Company, (9 Wendell’s R. 351.) But if it were, I do not understand the Revised *303 Statutes as imposing a limitation to the estate which any corporation may own, which is not found in its charter or in the provisions of the common law ; and they certainly do not declare that the capital stock shall in any case constitute such limitation.
In reference to the accumulation of the profits of the corporation, and thereby increasing their solid capital, I do not find any provision of law which forbids that course. We know perfectly well that our banking institutions, (all of which were chartered with limited capitals previous to the General Banking Act of 1838,) in the days of their prosperity, very frequently accumulated a large surplus, and used it to increase their business. No one, so far as I have heard, ever questioned their right to do so ; and the stock of those institutions was appreciated by the public precisely as they exhibited a greater or lesser amount of surplus property, beyond their capital and liabilities. The practice of monied corporations to accumulate their profits, has been recognized in our legislation relative to the banks, and has been before this court judicially in several cases. See Bank of Utica v. City of Utica, (4 Paige’s R. 399;) Lowerre v. American Fire Insurance Company, and De Peyster v. The Same, (6 ibid. 482. 486;) Scott v. Eagle Fire Company, (7 ibid. 198.)
The right to keep a surplus on hand, was not questioned in those cases, and in the insurance causes, it was declared by the Chancellor to be a duty in reference to outstanding risks. From the year 1830, to the present year, the custom of our banking corporations to accumulate their profits beyond their capital, has annually been brought before the legislature by the reports of the bank commissioners, which gave the condition of each bank, and exhibited such surplus in each instance where it existed; and during the current year the report of the comptroller exhibits the same details. Yet we have never heard of any doubt or question being raised as to the perfect right of these institutions to retain their profits as a surplus, if they ' preferred that course to dividing them. The legislature appears to have left this matter to the corporations themselves, wisely *304 deeming that the natural desire of all men to enjoy the fruits of their property, would be a sufficient preventive against any inordinate or dangerous accumulation.
In the case of Scott v. The Eagle Fire Co., ubi supra, the Chancellor says, if the directors without reasonable cause should refuse to divide what was actually surplus profits, the stockholders are not without remedy, if they apply to the proper tribunal. To this I may add, that they have in a great measure, the remedy in their own hands. They may eject the recusant directors at the next annual election, or if they fail to induce a majority of shareholders to join them in that proceeding, they may sell their stock and retire from the association.
In the charter in question, the corporation is authorized to receive the rents and profits of their exchange, and divide the same amongst the stockholders, at such times as they may deem expedient and proper. It is thus left entirely to the discretion of the trustees.
It is however said that this clause is mandatory, and that the permission to designate the times, for a division of profits, does not authorize a total omission to divide for a long period.
I cannot take this view of the clause in the charter. Whether the first time to be designated for a dividend of profits, shall be one year or twenty, is left to the corporation to determine. Nor is there any serious danger of inordinate accumulation, or of the growth of any overshadowing monopoly, by leaving corporations to pursue their own course in this respect. Few men would care to forego the receipt of an income from their stock, during their lives or for any long period, in order that in the next generation, their heirs may participate in the management of some gigantic corporation. The danger that the surplus may be squandered, or the control pass to unwelcome hands, is too manifest to induce the most ardent admirer of posthumous power and influence, to incur such hazard of his estate. And if there be any evils arising from such surplus accumulations, the legislature in their future action will apply the remedy.
Another argument which was made to bear upon both theories of the complainant’s counsel, was pressed upon me with great *305 force, viz. that the amount fixed as the capital stock of the corporation, was an absolute restriction upon the amount and value of the property both real and personal, which they may hold permanently.
Some modifications of this position, at once forced themselves upon the attention of the counsel. If the capital were the limit of the property of the corporation, they could make no dividends or profits, for those are beyond the capital. Again, in the ever varying and fluctuating values of all descriptions of property, a corporation that was within its capital last year, may without a single new purchase- or expenditure, be worth this year, twenty per cent, beyond its capital, by the increased value of the same property.
Hence the learned counsel were driven to rest their point upon a designedly permanent increase of property, beyond the capital of the Company. Still the rule encountered difficulties.
The object of corporators in all monied and business corporations, is to make greater profits than they can command by the separate use of the same amount of capital. They put in their money, the capital stock, for the very purpose of having it increase in value, and more rapidly than in private adventures. And we have seen, that unless positively enjoined by their charters, there is nothing to require them to divide the increase annually, or in any given time.
It was argued, that in this particular case, the design was one not referring to profits for ultimate division, but it was a permanent and solid investment of profits which never could be divided, and which became an essential and integral portion of the real capital of the Company. That the exchange was an unit, indivisible, and composed of the capital stock, and nearly as much more; the latter being added in anticipation of earnings or profits, and the whole incapable of partition or division.
On this subject of the capital stock of a corporation, the elementary treatises are comparatively barren.
It is the aggregate amount of the funds of the corporators, which are combined together under a charter, for the attainment of some common object of public convenience or private *306 utility. This amount is usually fixed in the act of incorporation, although we have seen in the statutes of 1823, one exception to this practice. It is thus limited, in reference to the convenience of the intended corporators, and for the information and security of the public at large. To the corporators, it prescribes the amount and subdivisions of their respective contributions to the common fund; the voice which each shall| have in its control and management; and the apportionment of | the profits of the enterprise. To the community, it announces I the extent of the means contributed and forming the basis of I the dealings of the corporate body, and enables every man to judge of its ability to meet its engagements and perform what it undertakes. And when, as in most instances, the statute requires the stock to be paid in before the corporation can transact business, security to those contracting with it, is thereby superadded to the information of its resources. These objects for the public benefit, are sometimes defeated by fraud and deception, but they are such as the legislature have in view in limiting the amount of capital stock, and requiring a specified sum or proportion to be paid in.
One further consideration dictates the amount thus fixed. This is the probable and reasonable extent of the means requisite to the accomplishment of the end proposed, qualified in many cases by the unwillingness of the legislature to create these artificial beings with an undue amount of capital.
As no certain rule can be devised by which to estimate the means necessary to effect all the purposes of a contemplated incorporation, the amount of the capital in each case must .be fixed in reference to the considerations which I have just enumerated ; without any intention or expectation in ordinary cases, of limiting to that sum the aggregate property which the corporation, when its capital is paid in, and its operations commenced, shall from time to time possess or own. This is peculiarly true of the numerous incorporations which have sprung into being under the magic influence of the enterprise and ingenuity of our citizens; and in which, from their boldness or novelty, it was impracticable for human foresight to calculate the requisite means.
*307 It is true that in one instance, the authors of a most excellent treatise on corporations, have spoken of capital stock, and the amount of property which they shall hold, as if they were synonymous terms. But they have said on a previous page, that every corporation aggregate has incidentally at common law a right to take, hold and transmit in succession, property real and personal, to an unlimited extent or amount. 1 Angell & Ames on Corp. 87, ch. 5, § 1. 1 Kyd on Corp. 76. 78; 1 Black. Comm. 475; 2 Kent’s Comm. 277, 2d ed.; and a host of authorities are to the same effect. Angelí & Ames also add that “ the statutes of mortmain make no mention of personal property ; and hence in England, the power of corporations aggregate to take such property, remains in general unlimited, unless restrained by the charters or acts of parliament establishing them.” Treatise on Corp. 90, 92. And see 1 Kyd on Corp. 104.
The capital stock of a corporation, is like that of a copartnership or joint stock company, the amount which the partners or associates put in as their stake in the concern. To this they add upon the credit of the company, from the means and resources of others, to such extent as their own prudence or the confidence of such other persons will permit. Such additions create a debt; they do not form capital. And if successful in their career, the surplus over and above their capital and debts, becomes profits, and is either divided among the partners and associates, or used still farther to extend their operations.
The proposition that a corporation is limited even in its permanent ownership of property, to the amount fixed as its capital, is entirely new, and has not the sanction of authority or reason. The custom of retaining the profits which I have before mentioned, has been long continued, and has worked in many of our corporations, and especially in banking institutions, an increase of their solid property and estate, as permanent as any that has been inferred in this case. Not that such increase has in those instances been so invested and mingled with the fruits of the original capital, as to become indivisible therefrom; but the increase has in many of the instances been as fixed and permanent as the capital itself, and with no purpose or probability of its being returned to the stockholders until the concern should be wound up voluntarily, or by the expiration of the charters.
*308 Some further illustrations of this question will occur, in connection with the discussion of the power of borrowing after the payment of the capital.
Second. The second theory of the counsel for the complainant was, that the power of borrowing money was limited to the extent of the «capital of the Company ; and when that capital was fully paid, the power ceased, except for mere temporary objects, and for short periods.
They therefore had no right to contract a permanent debt like these mortgages. That if .they did not expect to pay the mortgages, it is still worse, because by the means used, they created or attempted to create, a public stock or funded debt.
It was urged that on the latter hypothesis, they were exceeding the charter, because the direct consequence is, that they build at the expense of two millions, and out of the rents pay an interest to the bond-holders, and a dividend to the stockholders; and the one to continue as long as the other, being to all intents, a capital of two millions.
This argument is specious ; for if the building be worth the two millions which it is assumed to have cost, and the Company owes one million, their clear property is but one million after all. Then as to the funded debt or stock created and secured by these mortgages. The fifth section of the act of incorporation was referred to as prohibiting this mode of effecting a loan. That section declares that the act shall not be construed to authorize the dealing or trading in, or the purchase or sale of any stock or funded debt created, or to be created, under any law of the United States, or of any particular state.
If the resemblance between these bonds and such stock or funded debt, were complete in all things ; this section would have no application to the borrowing of money upon their issue. But in truth, the resemblance is very faint. The bonds were printed '<$$engraved, and had coupons attached for convenience in the collection of interest. There the likeness ceased. These bonds Wire sealed obligations of the Company; bonds, in the technical sense of the word; and secured not by *309 the public faith, or the mere corporate liability, but by mortgages on real estate.
But it was contended that the unrestricted power of borrowing, which the Company claims for effecting the purposes of its charter, virtually confers upon the corporation unlimited power. That the purposes of the charter would in this instance at least, be no restraint, because they could embrace accommodations for every description of commercial business; and the extent of their credit would be equally ineffectual, for there would be no limit to that, except in the prudence of the lender; and finally, that no such extravagant authority was granted to this corporation expressly or by implication, and it is contrary to the spirit and policy of our laws and institutions.
This whole argument is, in my judgment, unsound. The danger of inordinate accumulation of property and consequent overshadowing power, is wholly fallacious. The whole extent of the corporate credit, is in truth measured and controlled by its capital. Every addition to its means beyond its paid up capital, (leaving profits out of view,) must be by gift or contract, and if by contract, a debt ensues. If a corporation with a million of capital, succeeds in running into debt two millions, it has no more solid property, and is intrinsically worth no more than before, unless the property obtained on credit is worth more than it cost, and then the increase of property is only such excess of value. And if worth less than cost, then the company has by the operation, sunk a part of its capital.
All experience shows that the financial management of corporations, is in general less judicious and safe than that of individuals. Hence losses are likely to ensue from expansions upon credit; and the farther such credit is pushed by any corporation, the greater the danger that such losses will impair, and finally consume its capital. The lenders of money are usually sagacious enough to protect their interests when dealing with corporations as well as with individuals; and few would lend money to a company which already owed debts greatly exceeding its whole capital stock, however flattering in appearance the investment anight be. The laws of trade have placed *310 an impassable barrier to the power of corporate borrowing, in the tendency of such institutions to make an improvident use of exuberant means, and in the caution and prudence of capitalists. It is utterly impossible for a corporation with a known limited capital, to accumulate by means of its credit, the gigantic property and power which the imagination of the counsel portrayed.
In reference to the other limit to the use of borrowed means, the objects of the charter; the abuse of its privileges in this respect will bring down upon a corporation the arm of sovereign authority.
It is in vain to look in our laws for any express restriction of corporations, to the amount of their capital in the use of their credit. The history of those institutions in this country, shows that no such restriction exists. And our own experience informs us that many of them at this day, owe debts contracted in various modes, to twice the amount of their capital stock, and still appear to be perfectly sound and flourishing. The practice has been uniform and universal, and its legality, so far as I know, was never before questioned, although in the multitude of corporations which have failed, after defrauding the community, and have subsequently figured in our courts, many occasions have arisen for raising the point.
The legislature has sometimes interposed its authority by expressly limiting the use of the corporate credit; thus showing that unless so restricted, it was unlimited.
Thus in the special provisions relating to certain corporations, 1 Rev. Stat. 602, § 3, it is provided that the total amount of debts which any incorporated company shall at any time owe, whether for deposites, or on bond, &c., over and above the actual deposites with the company, shall not at any time exceed three times the amount of the capital stock paid in. And the consequence of an excess does not impair any contract or security, but is visited upon the directors offending, in behalf of parties injured thereby.
The New-York Life Insurance and Trust Company was incorporated in 1830 with a capital of one million of dollars, and was authorized amongst other things, to receive money in trust, *311 in deposite, and on loan, without restriction as to the amount. In 1834, a law was passed enacting that such amount at anyone time, should not exceed five millions of dollars, exclusive of moneys deposited by the courts. (Laws of 1834, ch. 250.)
In like manner, The Farmers’ Loan and Trust Company, a similar corporation, with a capital ultimately of two millions of dollars, was many years after it was chartered, limited by a new statute in the amount of its trusts, to five millions of dollars. (Laws of 1836, ch. 211.)
Our incorporated religious, literary and charitable societies usually have no capital stock, yet they run in debt, and borrow money, and this court is frequently invoked to authorize religious societies to mortgage their lands for such debts, under the peculiar limitations, of their corporate existence. Here we have another pregnant example of the inherent power of contracting debts, without reference to capital or property.
I have already spoken of the enlarged discretion in relation, to the extent of their real estate and buildings, which was conferred upon the Merchants’ Exchange Company by their charter. Nothing but a departure from good faith and a wilful perversion of their franchise in this particular, can properly be alleged against the exercise of the discretion of the trustees. It therefore would not impeach the transaction, if it were shown that a sufficient exchange might have been built with a million of dollars, or even that this exchange could, with more judicious management, have been constructed with that sum. At this day we can see that the judgment of the trustees in deciding upon the extent and architecture of the new edifice, was much, and perhaps unduly influenced, by the overflowing prosperity of the country in 1835 and 1836; a prosperity which proved to be hollow and delusive.
Two other historical facts had a great influence in the result. I allude to the rapid growth of this city in business, wealth, and population, after the completion of the Erie Canal in 1825; and the destruction in the old exchange, at the time of the great fire, of vast quantities of valuable merchandise. *312 which, while the fire was raging, were removed from its immediate range to the exchange, as a place of entire security.
We may concede, for the argument’s sake, that the trustees erred in their judgment in determining the dimensions, materials, and style of the new exchange. And there is no doubt but that they have expended more than the legislature, or the corporators, originally supposed would be necessary to accompplish the object. Yet the trustees were only restricted to such an expenditure as they might deem proper, and there is no ground for charging them with having laid out their means for any thing that they did not deem proper, nor for impeaching their good faith.
In this case, then, I am satisfied that the Merchants’ Exchange Company were authorized by law to borrow money for the completion of their building, to the extent adopted by them, and to secure its re-payment by their corporate obligations, and by mortgages on their real estate.
I do not find that any limitation contained in their charter has been thereby exceeded, nor that any condition annexed to the grant of their franchise has been broken, nor that they have failed to perform the duties enjoined upon them by the law of their creation.
It is unnecessary for me, in this view of the case, to inquire whether the complainant could take advantage of it, provided his counsel were correct, and the mortgages were an excessive exercise of corporate power.
The next objection to these securities is, that the issuing and circulation of the bonds in the form adopted, setting apart the whole property of the company as a security therefor, are contrary to the provisions of the restraining law, so called.
The act in question is entitled “ Of unauthorized banking, and the circulation of certain notes or evidences of debt issued by banks,” (1 Rev. Stat. 711, 712,) and the provision said to be invaded, prohibits any personor body corporate, except when expressly authorized by law, from issuing “ any bills, or promissory notes, or other evidences of debt as private bankers, *313 for the purpose of loaning them or putting them in circulation as money." The policy of the whole statute was to restrain private banking, and to give to the chartered banks and those regulated by law,- the exclusive privilege of circulating bank notes.'
The bonds in question were issued either for £200, or for $1000 each. They were literally bonds, under seal, and payable like a common bond for money, to'the person named as the obligee, or to his assigns. They were things in action, assignable at law, according to our decisions," by mere delivery, but not negotiable. Clark v. Farmers' Manufacturing Company, (15 Wend. 256.) They were not' issuéd for the purpose of loaning them, but the contrary, for the purpose of borrowing money. They were not capable of being put in circulation as money, or suitable for that purpose. On a bank note, any holder may maintain a suit in his own name. On one of these bonds, he would have to' sue in the name of James G. King. The restraining law is a penal act, and is to be construed strictly. The People v. Brewster, (4 Wend. R. 498.) There is no evidence of an intent' to circulate these bonds as money; and if intended, the design was abortive. In the case of the Attorney General v. The Life and Fire Insurance Company, (9 Paige’s R. 470,) the notes adjudged to fall within the restraining laws, were promissory notes, payable to a clerk of the corporation, and by him indorsed in blank, and were engraved with vignettes and other devices of bank notes. And see On this subject, Safford v. Wyckoff, (4 Hill’s R. 442.) The bonds in question clearly are not within the provisions of the statute against unauthorized banking.
The same objection is'made to the coupons annexed to the bonds, and which are payable to bearer. These form a part of each bond, and partake of its essence as a specialty. Miller v. Watson, (5 Cowen, 195;) Curtis v. Rush, (2 V. & B. 416.) When detached and due, they entitle the holder to the interest. They have no date, and are a mere order or direction for the payment of half a year’s interest falling due at a day specified, and upon a bond the number of which is therein'set forth. They *314 are not adapted to circulate from hand to hand like bank notes, and no such intention can be inferred.
Next, it is alleged that both of these mortgages were intended and executed by the Company, being insolvent, for the purpose in part, of paying or securing antecedent debts of the Company, and of thereby giving a preference to such creditors ; and that they are for that cause void, within the provision of the statute prohibiting a transfer or assignment of any of its property by a corporation in contemplation of insolvency. (1 Rev. Stat. 603, § 4.)
It is not proved that any of the bonds secured by the first mortgage were actually delivered, prior to the execution of that mortgage. A part of the first issue of $ 100,000 secured by the second mortgage, was delivered before the security was made or directed. But the evidence of any insolvency at that period, either actual or contemplated, is wholly wanting. Therefore without expressing an opinion whether a mortgage is a transfer or assignment within the meaning of the act, or whether the act itself applies to this corporation,- the objection must be disallowed.
Nor is there any thing in the argument upon the reverse of this proposition, that the mortgages were invalid because made to secure future advances. Such mortgages "are legal and have priority over liens which do not intervene before the advance is made. Brinckerhoff v. Marvin, (5 Johns. Ch. R. 320;) Lansing v. Woodworth, (before the Assist. V. C.) (a)
The objection to the sterling bonds, that they were illegal because made payable in London, thereby making it necessary and showing an intention to employ an agent there, to receive monies and pay the interest and principal; and that this was another usurpation on the part of the Company ; is shown to be entirely unfounded by the case of The Bank of Augusta v. Earle, in the Supreme Court of the United States, (13 Peters’ Rep. 521.)
*315 The complainant, in case he fails in impeaching the bonds and mortgages, insists that the transaction by which Mr. King was put into possession of the exchange was unauthorized; and that there should be a receiver appointed for the complainant’s benefit.
The case of Phyfe v. Riley, (15 Wendell’s R. 248,) is an authority that the Revised Statutes, abolishing the mortgagee’s remedy by ejectment to obtain possession after the condition broken, did not impair his right to retain the possession when he had lawfully acquired it, by the consent of the mortgagor or otherwise.
The complainant is not in a situation to raise this question. It is true his judgment is a lien on the exchange, but it does not affect or intercept the accruing rents, until title under it is perfected by a sale and conveyance by the sheriff. An execution returned unsatisfied, is necessary to create an equitable lien on the rents.
The bill prayed for a dissolution of the corporation, but as no point was raised on that subject at the hearing, I need not further allude to it.
It was said that it was a fraud upon the complainant who had given credit to the Company, solely on the security of its capital in the hands of its trustees, to permit special pledges of its capital, like these mortgages, to obtain a preference oxmr him. And the hardship of his case was vividly depicted to the court. The hardship, however grievous on either side, cannot bend the rule of law. But in truth this party has no just cause of complaint. The mortgages were given for cash lent, and the money expended upon the exchange, and several thousand dollars of it found their way into the complainant’s pocket, for his services upon the building. The mortgagees recorded their mortgages, and thus gave notice of their incumbrance to the whole world. The complainant xvhen he contracted, either knew, or by inquiry of the trustees, or examining the records of mortgages, might have known, of these incumbrances. He dealt xvith the Company, as he xvould xvith a natural person, at arm’s length, and with the same incentives and risk of loss; but *316 with the advantage in this case, that he knew of the amount of actual capital owned by the Company, while with individuals it is difficult to ascertain that point. And in reference to any excess of powe,r in the construction of the edifice, would not the architect, who was engaged on the work itself and in executing the decorative portions of it, be more likely to know that the Company was going too far, than the men who lent their money to be laid out in the general work of construction 1
There is no semblance of fraud in the case, nor as I can discover, any just ground of complaint. If the complainant has lost a part of his debt, the trustees and stockholders have lost their whole capital; and neither have any equity to avoid the mortgages in question.
This reference to th.e stockholders, reminds me that they were presented by the counsel for the complainant in the attitude of aggrieved parties, deeply injured by the execution of these mortgages, to secure persons among us who had instigated an extravagant expenditure upon the exchange, but were unwilling to furnish the means of completing it, without such security, thereby making the stockholders the real contributors to its erection, without any hope of a return of their money.
I can only regard the stockholders in this case, as identical with the corporation, and represented by that body. The trustees who from time to time directed the proceedings of the Company, were chosen annually by the stockholders, and their places would have been supplied by others, if their acts had not been in accordance with the views and wishes of their constituents. Those acts are therefore to be considered as sanctioned and approved by the parties immediately interested, as they doubtless were acceptable to this great commercial community.
Having examined and maturely considered all the points raised upon the hearing of this cause, and adjudicated upon them, without reference to any extrinsic consideration, I may be permitted to add my gratification to find that the law upholds the securities which this bill has assailed.
While I have the honor of holding a seat in this tribunal, I *317 .trust that no case of hardship, no argument founded upon ¡broken faith, will influence me to treat any corporation, (or persons participating with it,) which has usurped powers not delegated to it, or infringed any of its privileges, with an indulgence inconsistent with the express injunctions of law.
Corporate privileges are generally obtained with a view to .private interests, and they are ostensibly conferred to prosecute some single enterprise, or to pursue some one separate and distinct branch of business. The innate tendency of the desire of gain, acting in these institutions upon a restricted franchise, is to enlarge the authority granted, and this leads to usurpation.
The legislation of the several states has inundated the country with an infinity of corporations, created for almost every business and purpose known to a highly civilized and eminently commercial people; and I am fully satisfied that the interests of the public, as well as their own, will be best promoted by holding them to a strict accountability.
I am constrained to this conclusion, not so much by my want of partiality for these artificial beings, as by the recent and numerous exposures of gross mismanagement, peculations, and frauds in corporations, which have shocked, if not blunted, the moral sense of mankind.
Acting under proper restrictions, and honestly and faithfully performing their assigned duties, corporations have proved valuable instruments in accomplishing important enterprises and improvements, beyond the reach of individual wealth. The corporation in question was created for an object of public convenience and utility, with a feeble prospect of private gain or emolument to its stockholders. The accomplishment of its purpose required means beyond the amount of the fortune of almost every individual; and no mere partnership could be formed for such an investment, with its attendant hazards. The .passage of this act of incorporation, and the filling up of the capital stock, were results of the united efforts of several enterprising merchants of this city, whose public spirit and munificence shed a lustre upon our institutions and national character. They have erected an exchange which is a noble and enduring monument of mercantile taste and liber *318 ality, and a subject of just pride and admiration as an architectural ornament to our city. The world contains no other such work of private enterprise. The Exchange in London was erected, in a measure, and the Bourse in Paris, almost entirely, by the aid of the government.
With this proud temple of commerce in our midst, it would be most humiliating to be compelled to add the Merchants’ Exchange Company to the list of states and corporations, which by a direct or virtual repudiation of their debts,, have brought reproach and disgrace upon our character as a nation, and largely contributed to a demoralized state of society.
The courts of this state have hitherto stood unshaken, in a firm and undeviating application of the inflexible rules of law to all contracts, individuals and associations; and it is not to he apprehended that their judicial sanction will be given to any of those devices to avoid the payment of debts, which at once destroy credit, annihilate confidence in our political institutions, and corrupt the public morals.
The bill must be dismissed with costs.

 Reported ante, p. 43.