# ROCKINGHAM,

## JULY TERM, A. D. 1856.

### Pierce & a. v. Emery & a.

At common law nothing can be mortgaged that does not belong to the mortgager at the time when the mortgage is made.

If an act of the Legislature give a railroad corporation authority to issue bonds for a loan of money, and for security to make a mortgage to trustees of all the property, and all the rights, franchises, powers and privileges of the corporation, and in the mortgage to give the trustees power, on breach of the condition, to sell the real and personal estate, and all the rights, franchises, powers and privileges named in the mortgage, by a deed which should convey to the purchasers all the rights, franchises, powers and privileges, which the corporation possessed, and the use of the railroad, with all its property and rights of property for the same purposes and to the same extent that the corporation could use the same if the deeds had not been made, subject to the same liability as to the use of the road that the corporation would have been under, if the deed had not been made, and the corporation issue bonds and make such a mortgage, the trustees will hold under it property afterwards acquired by the road against other creditors, who claim the same property by virtue of later mortgages.

Such a mortgage is in substance and effect a conveyance under the act of the road and corporation as an entire thing, and subsequently acquired property becomes part of the original subject of the mortgage by accession.

If the corporation after such a mortgage become owners of a cargo of railroad iron, subject to the lien of the United States for duties, the mortgage will attach on the iron immediately upon its becoming the property of the road, subject to the claim of the government; and if an agreement is made by the road with certain individuals that they shall pay the duties, allow the road to lay the iron on their track, and retain a lien on the iron for the money so advanced, the lien, after the iron has been delivered to the road under this agreement, cannot be asserted against the mortgage to the trustees, unless they had notice of the agreement, and gave their assent, express or implied.

The assent of the trustees would in such case be binding on the bondholders.

Pierce v. Emery.

That the trustees under such a mortgage would hold subsequently acquired property as incident to the franchise mortgaged, and as an accession to the subject of the mortgage.

That under the mortgage in this case the trustees were entitled to hold personal property, acquired by the road after the mortgage, against subsequent mortgagees of the specific property so acquired.

The railroad, before the mortgage to the trustees, owned a cargo of railroad iron, subject to the lien of the United States for duties, and agreed with the plaintiffs that they might pay the duties; that the railroad might lay the iron on their track, and that the plaintiffs, if the road did not repay them the money advanced for duties within a specified time, might take up the iron and hold it for security of the money advanced.

*Held,* the iron having passed according to this bargain into the possession of the road, that the lien for the duties was gone, and could not be asserted by the plaintiffs against the mortgage to the trustees, but that the contract was valid between the parties to it, and that if the trustees had notice of it, and assented to it, the contract would be binding in equity on the trustees and bondholders.

BILL IN EQUITY. The following facts appear from the statements of the bill:

The Portsmouth and Concord Railroad, a corporation established under the laws of New-Hampshire, made to the complainants, Joshua W. Pierce, Alfred W. Haven, Josiah G. Hadley and to Alexander Ladd, deceased, whose executrix, Maria T. Ladd, is the remaining plaintiff, sundry mortgages, dated respectively February 12, 1850, July 6, 1850, March 10, 1851, May 29, 1851, August 19, 1851, and March 3, 1852, and also made sundry other mortgages to Joshua W. Pierce and Alfred W. Haven, two of the complainants, dated respectively June 26, 1852, July 13, 1852, August 16, 1852, October 15, 1852, November 16, 1852, December 26, 1852, February 12, 1853, June 27, 1854, September 23, 1854, and April 12, 1855.

The mortgages were of personal property, and the bill set forth a description of it as contained in the different mortgages, and specified the debts and liabilities secured by each. By the first two mortgages, made prior to August 20, 1850, besides specific articles named in the mortgages, all the personal property of the railroad was mortgaged; and by the subsequent mortgages the furniture of the road, locomotives, cars, fencing stuff, fuel, and other personal property, were mortgaged from time to time, in

some cases to secure debts that accrued before August 20, 1850, and in others, debts which accrued after that date ; but none of the mortgages were given on the sale of property to the road for security of the purchase money.

The mortgage of June 26, 1852, conveyed all the right, title and interest of the railroad to the railroad iron imported in the ship General Berry, then belonging to the road, subject to the lien of the United States for duties, being about 591 tons, to secure a note for $10,000, dated April 26, 1852, payable to Haven, Pierce, Emery, Batchelder, Cheever, Plumer, Walker, Knowlton, Stevens and Tullock, and a note for $5,100, dated June 4, 1852, payable to Emery, Haven, Pierce, Plumer and Batchelder. There was also inserted in this mortgage the following stipulation : " It is understood and agreed by and between the parties hereto, as follows : The said Haven and Pierce may pay the duties now due to the United States upon said iron, and have a lien therefor, as well as for the notes above named ; that said railroad may take said iron and use the same in laying the track upon said railroad, giving to said Haven and Pierce a memorandum in writing, between what points upon said railroad said iron is laid ; and that in case said notes shall not be paid at maturity, or the duties paid by said Haven and Pierce, as aforesaid, refunded, they may, by themselves or their agent, at any time after said notes become due, enter upon the land and premises of said railroad, take up said iron, and sell the same at public auction, at such place as they may think proper, and give proper bills of sale thereof, first giving ten days' notice thereof in some newspaper published in Portsmouth, and apply the net proceeds thereof to pay said notes and duties." Haven and Pierce paid the duties under this contract, amounting to $4,399.85 ; the iron was delivered to the road and laid in the track ; and in the month of July, 1852, a memorandum was given, showing between what points on the road it was laid. The bill does not state when the iron was delivered to the road, nor when it was laid in the track.

The several mortgages under which the plaintiffs claim remain

in whole or in part unsatisfied. All the property described in the mortgages made after August 20, 1850, was purchased by and came to the possession of the road subsequently to that date ; and all the property named in the mortgages running to Pierce and Haven, with the exception of the iron, was paid for with money lent to the road by the parties named in those mortgages, as is stated therein. In all these mortgages it is stated that they were given for the security of the parties named in them respectively. All these mortgages were duly executed and recorded in Portsmouth, which was by law established as the place of business for the road.

Since the 20th of August, 1850, a large part of the damages awarded to owners of land taken for the track has been paid by the road. In some instances the road has taken conveyances in fee of such land, and in some others the owners have conveyed the land to Alfred W. Haven, to hold in trust for the road, when the money advanced by him to the owners should be repaid by the road ; and in some cases the land damages are still unpaid.

On the 13th of July, 1850, the Legislature of this State passed an act entitled " An act to aid the construction of the Portsmouth and Concord Railroad," authorizing the road to issue bonds to the amount of $350.000, payable, with interest, in not less than ten, nor more than twenty years ; the act to take effect when the stockholders should accept and adopt it. The 3d, 4th and 5th sections of the act were as follows :

" SECTION 3. When said bonds are ready to be issued, said corporation is hereby authorized to mortgage, by a deed executed in the usual manner, to three discreet and suitable persons, to be selected by the directors of said corporation, as trustees for the holders of said bonds, the whole or a part of the real or personal estate of said corporation, by the acts incorporating the same, and acts in addition thereto, conditioned for the faithful payment of all the bonds which may be issued by said corporation under this act, and the interest which may accrue thereon ; and said mortgage deed may contain a power authorizing said trus-

tees, upon such terms and conditions and under such limitations and restraints as may be therein inserted, upon the non-payment of any one or more of said bonds, or the interest which may accrue and be due thereon, to, sell the real and personal estate, and all rights, franchises, powers and privileges named in said mortgage deed, or any part thereof, and convey the same to the purchasers thereof.

" SECTION 4. The deed of said trustees, duly executed according to the provisions contained in said mortgage deed, shall transfer and convey to said purchasers all the real and personal estate named in said mortgage deed, together with all the rights, franchises, powers and privileges in relation to the same which said corporation enjoyed or possessed, or were entitled to at the time of the execution of said mortgage deed under the acts incorporating the.same ; and said purchasers shall thereby acquire all the rights, franchises, powers and privileges which said corporation possessed, and the use of said railroad, with all its property and rights of property, for the same purposes and to the same extent that said corporation could use the same if said deeds had not been made ; subject to the same liabilities as to the use of said railroad that said corporation would be under if said deed had not been made.

" SECTION 5. The directors of .said corporation shall, notwithstanding said mortgage deed, have the power and authority to sell and dispose of any of the personal property of said corporation ; *provided,* they purchase with the proceeds thereof other property to an equal amount, which shall be holden by said trustees under said mortgage, in the same manner as if the same had been owned by said corporation at the time of the execution thereof, and included specifically in said mortgage deed."

On the 3d of August, 1850, the stockholders met, accepted the act, and authorized the directors to appoint trustees, make a mortgage, and issue bonds at their discretion. On the 20th of August, 1850, the directors made a mortgage to Robert Rice, William Plumer, Jr., and Josiah Minot, trustees for those who were or should become holders of the bonds, to secure payment

of bonds to the amount of $350,000, issued the same day. The original trustees, by death and resignation, are now out of that office, and the defendants, James W. Emery, Thomas L. Tullock and Nathaniel White, are substituted by appointments made under the act and mortgage.

The mortgage deed to the trustees recites that the trustees had been appointed under the act to take and hold security on all the property of said company, and all its rights, franchises, powers and privileges, in mortgage and in trust, for the payment and security of whoever then or thereafter might become the lawful holders of said bonds, or any of them, and conveys to the trustees, in the name of the Portsmouth and Concord Railroad, " the railroad of said corporation, together with all its rights, powers, franchises and privileges," in the towns in which it was laid out, " with all the lands, buildings and fixtures thereto belonging, or which might thereafter thereto belong, with all the rights, franchises, powers and privileges now belonging to and held, or which may hereafter belong to, or be held, by said corporation ; together with the locomotive engines, passenger, baggage, dirt, freight and hand cars, and all the other personal property of said corporation, as the same now is in use by said corporation, or as the same may be hereafter changed and renewed by said corporation ; to have and to hold the said railroad, franchises and estate aforesaid, whether real or personal, with all the privileges and appurtenances, legislative grants, powers, rights, and privileges, now or herefter granted, thereto belonging," in trust for the bond-holders, and in mortgage for security of the bonds ; and the trustees are empowered by the deed, on breach of the condition, to sell " the said railroad," and to make all necessary conveyances, " passing all the property, real, personal and mixed, rights, powers, franchises and privileges of this corporation," to the purchaser or purchasers.

On the same 20th of August the directors issued bonds to the amount of $350,000, from which the road realized $289,535, and no more. At that time the road owed about $158,700, and

have since expended in constructing and furnishing the road àt least $573,000, and of the debts then owing more than $100,000 have been paid.

The condition of the mortgage to the trustees having been broken, the present trustees, Emery, Tullock and White, at the request of certain bond-holders, according to the terms of the mortgage, on the 14th day of May, 1855, applied to the directors to surrender to them all the mortgaged premises ; and the directors by deed of surrender dated May 31, 1855, surrendered and transferred to them all the property, rights, powers, franchises and privileges named in the deed of mortgage, to hold according to the terms and conditions thereof. The trustees have taken possession of the road, and under their mortgage claim the property mortgaged to the complainants ; and the property has been delivered into the hands of the trustees, under an agreement that it should be used in operating the road, and a compensation paid for it.

The stockholders have voted that it is inexpedient to redeem the road and its property from the mortgage to the trustees, and under the provisions of the mortgage the trustees will be bound to sell, in about eight months from the 31st of May, 1855, and they threaten to include in their sale the property mortgaged to the complainants.

The original trustees, when they took their mortgage, had notice of the prior mortgages, and also many persons who afterwards became purchasers and holders of the bonds.

The present trustees and the Portsmouth and Concord Railroad are the parties defendant to the bill.

The bill prays that the trustees may be decreed to pay the complainants the debt secured by their mortgage, before they sell the property mortgaged to the complainants, and be enjoined not to sell until they pay ; or, if allowed to proceed with the sale, may be decreed to pay out of the proceeds the debts secured by the complainants' mortgage, for a foreclosure and for general relief.

The defendants demurred to the bill, and a number of the

bond-holders were heard, without objection, in support of the demurrer.

*C. L. Woodbury*, (with whom was *W. H. Y. Hackett*,) for the bond-holders.

We take the following positions:

I. That the land, having been taken by authority of the State for a public use, and conveyed by charter to the corporation, the corporation hold it on a trust, which is the making of a road in which the public are to have a continual easement.

That any fixtures, placed on the real estate taken for this public use, enured to the benefit of the State on the failure of the corporation to perform its trust.

II. That the corporation have no power to impair, by mortgage or other conveyance, the easement of the public in the road, or to convey any domain over said route without consent of the State.

III. That the act of the Legislature authorized the mortgaging of, and the corporation did, by apt words, convey, the whole of said railroad, together with all the rights, franchises, powers and privileges which the said corporation possessed, in relation to the same.

Proposition I.—That the corporation holds a trust for the public use in the road and land. *Willink* v. *Morris Canal Co.*, 3 Green's Ch. 403. Their performance of the trust will be compelled by mandamus.

To relay the rails they have removed, *Severn and Wye Railroad*, 2 B. and Ald. 646; also reported in 1 English Railway Cases, Smith & Bates' Ed.

To build the road where they have taken land, 16 English Law and Equity 299, 327; 7 ditto 283; 6 ditto 332; Angell .& Ames on Corp. 776; 8 Serg. & Watts; 15 Jur. 991; Shelford on Law of Railways 570, 571.

Franchise cannot be severed or apportioned. 10 American Jurist 96, *et seq.*; *Dumpors' Case*, 4 Coke 119; Viner's Abridgement, Apportionment, A.

The language of the grant of the deed of trust can have no other interpretation than a conveyance of the whole road, the easements, fixtures and appurtenances.

Deeds operate in that form which shall effectuate the intention of the parties. Lord *Mansfield*, in *Goodtitle* v. *Bailey*, Cowper 600; *Roe* v. *Trainer*, 2 Wils. 75; *Hotham* v. *East India Co.*, Doug. 277.

Every exception must be taken strictly against the grantor. 10 Coke 106, C.

The words, " with all the lands, buildings and fixtures thereto belonging, and which may hereafter thereto belong, with all the rights, franchises, powers and privileges now belonging to or held, or which may hereafter belong to or be held by said corporation," constitute a good conveyance of all and singular the things included therein. Such grants are good when coupled with some present interest. Comyn's Dig., Grant, C.; Shepherd's Touchstone, chap. 12, p. 238; *Grantham* v. *Hawley*, Hobart 132.

Things inseparably incident to others are not grantable without the thing to which they are so incident and belonging. Shepherd's Touchstone 238–241; 2 Kent's Com.; 1 Powell on Mortgages 23.

Mortgage of things not *in esse* is upheld in equity. *Mitchel* v. *Winslow*, 2 Story 630; *Curtis* v. *Auber*, 1 J. & W. 581; *Wright* v. *Wright*, 1 Ves. 411; *Beckley* v. *Newland*, 2 P. Wms. 182; *In re Warre*, 8 Price 269; *Langton* v. *Horton*, 1 Hare 549.

Right to reclaim usury is assignable in equity. *Breckenridge* v. *Churchill*, 3 J. J. Marsh. 13.

Where there is a chancing bargain, and no fraud, the parties are bound by its terms. *Merriweather* v. *Herraw*, 8 B. Mon. 162; *Warnestrey* v. *Sanfield*, 1 Ch. 29.

A grant of a future possibility, not good in law, yet a possibility of a trust in equity, may be assigned.

That a contract to charge property subsequently acquired " is sufficiently established." Per Lord *Cottenham*, *Wellesly* v. *Wellesly*, 4 M. & Cr. 579; *Lyde* v. *Minn*, 1 M. & K. 683.

That the authority given in the act of the Legislature, section 3, to mortgage the whole, &c., taken in connection with the declaration in section 4, that the purchaser shall thereby acquire " the use of the said railroad, with all its property," and rights of property, authorizes a mortgage of the present and future rights and property of the road. General words in a statute must have a general construction. *Kilpatrick* v. *Birney*, 25 Miss. 582 ; *Jones* v. *Jones*, 6 Shepley 312 ; *United States* v. *Fisher*, 2 Cranch 386–397.

Words of statutes are to be taken in their general use. Dwarris on Statutes 47–51 ; 4 Rep. 47 ; *Rex* v. *Turvey*, 2 B. & Ald. 522 ; 7 Mass. 524 ; *May* v. *Raymond*, 9 Pick. 285 ; 1 Pick. 248.

If the title in fee of this public road was in the corporation at the time of the mortgage, it passed to us ; if in the State, *semble*.

The words of grant in the deed were. words of warranty. *Willink* v. *Morris Canal Company*, 3 Green Ch. 403 ; 7 Greenl. 96 ; 2 Binney 95 ; 8 Paige 861 ; 4 Wendell 622 ; 2 Caines' C. E. 188 ; 4 Cowen 599 ; 4 Cruise's Dig. 295 ; 15 Johns. 193.

The superstructure, track, &c., are fixtures, and pass by the deed as well as other appurtenances. *Willink* v. *Morris Canal Company*, 3 Green Ch. 403 ; *Severn and Wye Railroad*, 2 B. & Ald. 646.

Things personal, fitted and prepared to be used with real estate, and essential to its enjoyment, and being on the land, pass with it, as part of the realty. *Farrar* v. *Stackpole*, 6 Greenleaf 167 ; *Tyler* v. *Remick*, 2 S. & R. 390 ; 1 H. Bl. 259 ; 1 Bailey 541 ; *Elwes* v. *Mawe*, 2 Smith's Ld. Cas. ; *Pyle* v. *Pennock*, 2 Watts & Serg. 116 ; *Vorhies* v. *Freeman*, ditto 390 ; *Walker* v. *Sherman*, 20 Wend. 655 ; *Powell* v. *Monson Manufacturing Co.*, 3 Mason 462.

A. The bond-holders, having a right under their mortgage to all the fixtures attached to the road, subsequent to the execution thereof, a trust was raised in the corporation in favor of the bond-holders, to the end that the iron should be applied to the road for the benefit of the bond-holders, as a part of their security under said mortgage, and the corporation could create no

charge upon said iron, in favor of the directors, as against the bond-holders.

A trust was raised: 1. By the express terms of the instrument. 2. By implication.

Every agreement for a lien, or charge *in rem*, constitutes a trust. *Fletcher* v. *Morey*, 2 Story 555–565 ; *Legard* v. *Hodgers*, 1 Ves. Jr. 477.

Agreement to set aside a particular fund for the benefit of a creditor, raises a trust. *Ex parte Atkins*, 2 Y. & Col. 537 ; *Ewing* v. *Arthur*, 1 Humph. 537.

The resolutions of the stockholders, set out in the deed of trust as their authority, that the said directors " shall apply the proceeds of said bonds to the payment of the debts, to the construction and equipment of said railroad," constitute them trustees for this duty, and mortgages of such proceeds to secure themselves, are in fraud of the trust. *Ithell* v. *Beane*, 1 Ves. 215 ; 2 Spence Eq. Jur. *385–134 ; 2 Ves. & B. 370.

B. The complainants' mortgage is void as against the bond-holders, because the complainants took their mortgage with notice of the prior mortgage of the bond-holders, and their mortgage is valid, not only as against the corporation, but against all claiming under it with notice.

Where a lien or equitable claim, constituting a charge *in rem*, is a matter of agreement, it will be enforced in equity, not only against the party himself, but against all claiming under him, with notice. *Fletcher* v. *Morey*, 2 Story 555 ; *Collyer* v. *Fallon*, 1 S. & R. 469 ; *Legard* v. *Hodgers*, 1 Ves. Jr. 477 ; 2 Story Eq. Jur., § 1231, *et seq.*

The complainants had notice, as individuals, as stockholders, and *ex officio* as directors.

The bond-holders' mortgage was recorded. This was notice to all the world, not only of the contents thereof, but of the equities created thereby and arising therefrom. *Bolles* v. *Chauncy*, 8 Conn. 389 ; *Dick* v. *Balch*, 8 Pet. 30 ; *Willink* v. *Morris Canal Co.*, 3 Green Ch. 377 ; 4 Kent's Com. 174 ; *Le Neve* v. *Le Neve*, 2 Lead. Cas. in Eq., p. i. 160. They had actual notice.

Pierce *v.* Emery.

There is no difference as to the general right of a mortgagee, claiming under a corporation, and one claiming under an individual. *Willink* v. *Morris Canal Co.*, 3 Green Ch. 377.

Fixtures, whether attached at time of execution of mortgage or subsequently, pass to the mortgagee irrespective of the express stipulation to that effect. *Longstaff* v. *Magoe*, 2 A. & E. 167 ; *Hitchman* v. *Walton*, 4 M. & W. 416 ; *Ex parte Quincey*, 1 Atk. 477 ; *Robinson* v. *Preswick*, 3 Edwd. Ch. 246 ; Amos and Ferard on Fixtures 188, 198 ; *Dispatch Packets* v. *Bellamy*, 13 N. H. 205–233 ; 1 Hill on Mortgages 195, n.

Subsequently attached fixtures pass to mortgagee. *Curtis* v. *McLagin*, 16 Shep. 115 ; *Butler* v. *Page*, 7 Met. 40 ; *Smith* v. *Goodwin*, 3 Greene 172 ; *Winslow & als.* v. *M. Ins. Co.*, 4 Met. 306 ; *Tyler* v. *Pennock*, 2 S. & R. 390 ; *Boorhis v. Freeman*, 2 S. & R. 116 ; *Pettingill* v. *Evans*, 5 N. H. 54 ; *Jewett* v. *Partridge*, 3 Fairf. 243 ; *Lysle* v. *Duncombe*, 5 Binney 585.

Proposition II. — In England, the right to mortgage is given either by charter or by general law, " the undertaking and tolls." Acts 8 and 9 Victoria, chap. 16, § 38. This does not include the company's lands. Walford on Railways 126 ; Shelford, Law of Railways 155–694. The English cases admit on such mortgages a right to receive the tolls and to sell the general property.

The right to enter by mortgagees is limited, as " *it might defeat the object of the charter.*" *Myatt* v. *St. Helen's Railway Co.*, 2 Adol. & Ellis, N. S. 364 ; 2 Railway Cases 756.

Nor to be paid out of their stock and property as carriers. *Hart* v. *Eastern Railroad Co.*, 6 Rail. Cases 818 ; 7 Excheq. 264. See, also, Shelford, Law of Railways 156. The mortgage of tolls is not unusual here. Mass. and N. H. in Turnpike Cases.

In England, the power to sell the land on which the road lies is not admitted. 14 Adol. & Ellis 68 ; Eng. Com. Law 902.

In the United States, a general power to mortgage is disputed. 10 American Jurist 92.

An assignment will not convey the franchise, but the receipts and profits may be. Angell & Ames on Corp. 185, 186, and

cases; 9 Smedes & Marsh. 394; 3 Comstock's Appeal 338; 1 Grat. 364; 6 Rob. La. 246.

Where road had a title in fee in the land, and statutes authorized levy on *fi fa.* it was held that purchaser was entitled to hold to the close of the term of charter, in spite of dissolution of the corporation. *State* v. *Rives,* 5 Iredell N. C. 305; *semble, Nichol* v. *New-York & Erie R. R.,* 12 Barb. 460; *Allen* v. *Montgomery R. R.,* 11 Ala. 437.

In none of these cases has it been held that the road could be divided or severed, except 5 Ired. — Rives' Case.

The franchise cannot pass except by authority of special statute. *State* v. *Rives,* 5 Iredell 305; 11 Ala. 437; 12 Barb. 460; 10 Johns. 389; 9 Smedes & Marsh. 394; 13 Serg. & R. 210.

The franchise was included in the mortgage by authority of law. *Allen* v. *Montgomery R. R.,* 11 Ala. 437; *Willink* v. *Morris Canal Co.,* 3 Green Ch. 402.

Proposition III. — Where there are no negative words, the court will allow, *ex necessitate,* a latitude of construction. The construction must be according to the intention of the Legislature. *Williams* v. *Pritchard,* 4 T. R. 2.

The ends contemplated are to be considered, and where that is clear the court will not allow it to be controlled by the wording of a particular clause. *Curling* v. *Chalklen,* 3 M. & S. 510.

Remedial statutes, and those made *pro bono publico,* are to be liberally construed; that is, such a construction as may, as far as possible, further the end proposed. *Bradley* v. *Clark,* 5 T. R. 197; *Pierce* v. *Hopper,* 1 Stra. 253.

Such a construction should be given as will best effectuate the intention of the makers. The letter thereof may, therefore, be enlarged or restrained. *Somerset* v. *Dighton,* 12 Mass. 383; *Whitney* v. *Whitney,* 14 Mass. 88; *Holbrook* v. *Holbrook,* 1 Pick. 248, 258.

All acts *in pari materia* are to be construed as one law. *Ex parte Carruthers,* 9 East 44; *Church* v. *Crocker,* 13 Mass. 17, 21; *Holland* v. *Makepeace,* 8 Mass. 418, 423; *Goddard* v. *Boston,* 20 Pick. 407.

The complainants are estopped denial of their deed, or any of the covenants or stipulations therein contained. *Watkins* v. *Peck,* 13 N. H. 360; *Wark* v. *Willard,* 13 N. H. 389; *Prichard* v. *Sears,* 6 A. & E. 475; 2 Smith's Ld. Cases 457.

*Hatch & Marston,* for the complainants.

We will first consider the questions applicable alike to all the mortgages.

I. Had the railroad, under the circumstances, authority to make them?

Corporations can make every species of deed, and every kind of contract proper, as the usual and ordinary means of carrying on its business under the circumstances in which it may be placed, which are not prohibited by law; and this as fully and completely as individuals. Angell & Ames on Corp., § 220, 257, 258, (Ed. of 1852.)

This point was carefully considered, and a large number of authorities examined by the Chancellor of New-York, and the result to which he arrived was, that a corporation has the absolute *jus disponendi* of its lands, goods, chattels, &c. *Barry* v. *Merchants' Ex. Co.,* 1 Sand. Ch. 280.

Railroads, although *publici juris* in some respects, are the subjects of private property, and it is in that character that they are liable to be sold, unless forbidden by the Legislature; not the franchise, but the estate of the corporation in the land, which is a distinct thing from the franchise. *State* v. *Rives,* 5 Iredell 310, 311.

Although a railroad corporation, by a special provision of its charter, is empowered to mortgage its effects, &c., for a particular purpose, this will not be construed as taking away or abridging its general power to execute a mortgage for the security of creditors. *Allen & a.* v. *Montgomery Railroad Co. & als.,* 11 Alabama 438; and see *McComick* v. *Parry & a.,* 11 Eng. L. & Eq. 551.

That corporations have power to mortgage their personal property, has been fully settled in this State. *Despatch Line of Packets* v. *Bellamy Manuf. Co.,* 12 N. H. 236.

This power is recognized in this State by statute. Comp. Laws 295, ch. 138, sec. 18.

On what ground can the mortgages of February 12 and July 6, 1850, upon a portion of the furniture, made to a portion of the complainants prior to the date of the mortgage to trustees, to bond-holders, be disputed ?

They were executed to secure actual advances made in money to the corporation, and which has been expended solely for its benefit ; they were duly recorded in the town or city established by an act of the Legislature as the principal place of business of the corporation. This of itself is notice to all the world. Compiled Laws 293, 294, ch. 138, sec. 1, 2 and 10.

Besides, the trustees named in the mortgage, and many of those who became bond-holders, had actual notice of these claims. And, lastly, this furniture has been transferred and delivered to the defendants, subject to this incumbrance.

What equity would there be in allowing bond-holders, (creditors who have become possessed of their claims at a low figure,) and who are subsequent mortgagees with notice, to step in and set aside a prior incumbrance, *bona fide* made to secure money actually advanced to the full amount ?

II. Did the mortgage of August 20, 1850, to trustees for bond-holders, cover or include the iron and furniture purchased and received by the railroad subsequent to its date ?

1. It did not, for the reason that this property was not, as to said railroad, in existence, or in the ownership of the railroad at the date of that mortgage.

As a general rule, an assignment will not at law pass chattels not in existence, or not in the ownership of the grantor, or not sufficiently appropriated at the time of the assignment ; although such an assignment may have effect by a subsequent act of the grantor in furtherance of the original disposition. 2 Hilliard on Mort. 196, sec. 12 ; Coote's Law of Mort. 235, 236 ; original pages 283, 284.

A man cannot grant or charge that which he hath not. Perkins, sec. 65.

A man cannot grant a thing which he hath not, though he afterwards possess it ; as if he grant a rent out of land, and afterwards purchase the same land, the grant is void. 4 Com. Dig. 310, Grant, D.

A man cannot grant all the wool that shall grow upon the sheep that he shall buy hereafter, for there he hath it neither actually or potentially. Hobart 132.

Defendant, by a deed poll, bargained, sold and delivered all and singular his goods, household furniture, plate, &c., and other effects whatsoever then remaining and being, or which should at any time thereafter remain and be in, upon or about his dwelling-house at, &c., and also all other his effects elsewhere. *Held* the grant was void as to the property, &c., not on the premises at the time of the grant, unless the grantor ratify the grant by some act done by him after he has acquired the property therein ; but that carrying the goods, &c., upon the premises after the execution of the grant was not such a ratification. *Lunn* v. *Thornton,* 1 Man. Gran. & Scott 379.

A mortgage by a grantor of all his goods and farming stock, which were then or which at any time during the continuance of the security should be in, about and belonging to the grantor's house and farm, &c., does not operate to convey property thereafter to arise or be brought upon the premises. *Gale* v. *Burnell,* 7 Adol. & Ellis 850, new series ; *Tapfield* v. *Hillman,* 6 Man. & Gran. 245, is of a like character.

A mortgage of his whole stock in trade by the mortgagor in the shape the same is and *may become,* in the usual course of the mortgagor's business as a trader, will not hold or convey property acquired subsequent to the date of the mortgage, and the taking possession of the property by the mortgagee for the purpose of foreclosing the mortgage, will not alter or affect the case. *Jones* v. *Richardson,* 10 Met. 488. The doctrine established by this case was fully confirmed in *Mundy* v. *Wright,* 13 Met. 17.

In *Mogg & a.* v. *Baker,* 3 Mees. & W. 195, it was held that an agreement to mortgage furniture to be subsequently acquired,

to give a bill of sale at a future day of the furniture and goods of the insolvent, would cover no specific furniture and confer *no right in equity*.

This and the other English cases above cited the court say, in *Moody* v. *Wright*, 13 Met. 31, 32, overrule the *dicta* in *Langton* v. *Horton*, 1 Hare 549. And the court further say, that these principles are equally sound and equally to be enforced, whether the question as to the right of property is raised in a court of law or of equity.

In *Tapfield* v. *Hillman*, 6 Man. & Gran. 249, *Maule*, J., says: Although we may conjecture that the intention of the parties was that the mortgage deed should embrace after acquired property, still, if we could see with certainty that they had such an intention, it would not prevail unless the deed contained words sufficient to carry the intention into effect.

Neither in the act authorizing the issue of bonds, nor in the mortgage given to secure the same, are there any words which can embrace property acquired after the date of the mortgage; nor are there any words or language which show that it was the intention to include in the mortgage property acquired after its date. As to personal property, it is clear that it was the intention not to include it. The mortgage specifies the personal property, and says, " As the same now is in use by said corporation, or as the same may be hereafter changed and renewed by said corporation." The latter part of this clause refers to the power given in the fifth section of the act authorizing the directors, notwithstanding the mortgage, to sell the personal property included in it, and with the proceeds purchase other property to be held in the place of that sold, and in the same way and manner as if specifically included in the deed. If it had been the intention that the mortgage should cover personal property acquired after its date, neither the authority specified in the fifth section of the act, nor that part of the clause in the mortgage, would have been necessary.

It was not the intention of the Legislature to give the corporation power to make personal property, acquired after its

date, subject to that mortgage. The third section, which author-izes the grant, speaks only of the then present property of the corporation ; and the power given in that and the following sec-tion, authorizing a sale in a certain event, and the giving a deed by the trustees, extends only to such real and personal estate, rights, franchises, &c. as the corporation enjoyed or possessed, or were entitled to at *the time of the execution of the mortgage deed.*

We submit, therefore, that neither at law or in equity can it be holden that the mortgage in this case covers personal property acquired after its date, for the reasons that the corporation had no power by law to make such a mortgage ; that there are no words in the mortgage which covers such after acquired prop-erty ; that it was not the intention to include such property; but, on the contrary, it fully appears that it was the intention that it should not be included.

This property not having been included in the mortgage of August 20, 1850, to the trustees, it follows, from the authorities herein before cited, that the railroad had power to dispose of it or pledge it, *ad libitum*, in such a way and manner as might be most conducive to its interests.

We will now consider the mortgages more particularly.

1. Mortgages upon the furniture. These were given in good faith, for money actually advanced to the full amount, which has been expended in constructing and equipping the road.

The interests of the stockholders have in no way been injured by the manner the money has been raised, or by its expenditure, but rather have been benefited thereby.

The defendants received this property subject to the incum-brances existing thereon.

We do not understand that these securities are seriously im-pugned.

2. Mortgages upon the iron. Of these there are three. One dated May 29, 1851 ; one dated August 19, 1851, and the other June 26, 1852. The last differs from the other two, as it contains an express provision giving the mortgagees power

to enter upon the railroad, in case of the non-payment of the money therein named, and take up the iron and sell it, in the way prescribed in the mortgage.

(1.) This difference is, we apprehend, more in appearance than reality. Mortgagees of personal property have, in case of the non-payment of the debt secured, a right, by the statutes of the State, to take the property, hold it for a certain time, and then advertise and sell it. Compiled Laws 295, ch. 138, secs. 17 and 18.

A mortgage of goods in a store, furniture in a house, or other personal property upon the premises of the mortgagor, must be understood to include a license, in case of non-payment of the debt, to enter the premises of the mortgagor and take the property. This is incident to the security, otherwise it would be worthless ; in fact no security at all.

As to the cargo imported in the General Berry, contained in the mortgage of June 26, 1852, an express license is given ; as to the other, a license may be inferred from the transactions between the parties. It was known to the parties, if the corporation took the iron and laid it down, to what use it would be put, and it must have been understood that such use was not to deprive the mortgagees of their rights or their property acquired by virtue of the mortgages in the iron. It must, from the nature of the transaction, have been understood that in case the debts named in the mortgages were not paid, the complainants should have a right to avail themselves of the security on the iron. To do so they must take it up and sell it, and it follows that they must have a license to enter upon the road for this purpose.

It is said that there is a trust in the corporation that the iron should be applied to the road for the benefit of the bond-holders. (See deft's brief, page 493, A.) If this position were correct, what would follow ? When the trustees or directors had expended the whole proceeds of the bonds, as directed by the resolution of the stockholders, and still the road was not finished, and the iron, without further funds, could not be applied to the road

for the benefit of the bond-holders; could not even be relieved from the liens upon it for freight and duties; would not such trustees under such circumstances be authorized to borrow money for the purpose of completing the objects of the trust, and give security therefor upon a part of the trust property? A statement of the case seems to furnish the answer. And upon the principles applied in the case of the bottomry bonds, would it not be proper to give that security in such a manner as to take precedence of the mortgage to trustees for bond-holders?

We contend, however, that no such trust arises in this case, for the whole proceeds of the bonds have been expended upon the road, and also a further sum, exceeding the whole amount of the bonds issued. What right then have the bond-holders to complain?

How are the equities as between the complainants and the bond-holders? At the time a portion of the directors and their friends advanced their money and credit, and took the securities named in their bill, the road was at a dead stand; the iron was held subject to duties and liens for freight. If the complainants had not stepped into the gap, the bond-holders themselves would have been obliged to have stepped in and advanced the funds necessary to complete the road. A portion of the directors and their friends saved them the trouble, and now the bond-holders coolly ask that the securities for the money and credit thus advanced be set aside in their favor, and rest their claim principally upon technical grounds of the sharpest character. Nay, more; the parties who make this modest request all purchased their bonds at a discount, and many at a very large discount, while the complainants have advanced every dollar for which they now seek indemnity.

PERLEY, C. J. Corporations, as a general rule, have power to sell their property, real and personal, and to mortgage it for the security of their debts. Com. Dig., Corporation, F, 18; *Barry* v. *Merchants' Exchange Co.*, 1 Sand. Ch. 280; *Despatch Line of Packets* v. *Bellamy Manuf. Co.*, 12 N. H. 206.

Railroads, by the law of this State, are public corporations, so far as to be subject in many respects to general legislation and the control of the public authorities. They are created to answer a public object, and are bound to the State for the performance of their public duty. They can do no act which would amount to a renunciation of their duty to the public, or which would directly and necessarily disable them from performing it. They cannot convey away their franchise and corporate rights, nor perhaps the track and right of way which they take and hold for the necessary use of their road.

But they may contract debts; may purchase on credit; and we see nothing in the nature of their business, or in their relation to the public, which should prevent them from making a valid mortgage of their personal property, not affixed to the road, though used in the operation of it. Instead of disabling the road from performing its public duty, a mortgage might assist in doing it, in the same way that other corporations or individuals are aided in carrying on their business by mortgages of their property.

The two mortgages made to the complainants before the mortgage to the trustees for the bond-holders, we think are valid to hold the personal property specifically described in them for the security of so much of the debts as remain unpaid. The bill does not state how much of those debts are still due. But the complainants have no right in the road by virtue of those mortgages; they must assert their security by taking the property away, as in the case of a mortgage by an individual.

A different and more difficult question arises as to the claim of the complainants under mortgages made after the 20th of August, 1850, the date of the mortgage to the trustees for the bond-holders.

The ground taken by the bond-holders is that the act of the Legislature authorized a mortgage, not only of the property which at the time belonged to the road, but of all the franchises and corporate rights of the road, and the road itself: That the trustees under such a mortgage would take, as security for the

bonds the railroad, and all its franchises and rights, as one entire thing, and that, as incident to this mortgage of the road and its franchise, all the property, real and personal, which might at any time afterwards become vested in the road, would be covered by the mortgage, and held by the trustees, subject to the right in the directors, until breach of the condition, of managing the road for the benefit of all concerned, and of selling such of the property from time to time as might be convenient in the course of the business, provided they substituted other property of equal value ; that when the trustees should make a sale under their mortgage, all the property, and all the franchises and corporate rights of the road would pass to the purchasers, subject in their hands to the public liabilities and duties of the corporation ; that the mortgage deed in this case exhausts the powers conferred by the act, and covers the road and its franchises, and the accruing property, as an accession to the thing mortgaged, and as part and parcel of it ; that consequently the lien of the mortgage to the trustees attached upon property subsequently acquired immediately upon its vesting in the road, and the claim of the complainants must be postponed to the mortgage made for security of the bond-holders.   Whereas, the complainants maintain that the act confers no power to make such a mortgage, and that the mortgage to the trustees does not cover property of the road subsequently acquired.

We take it to be a general rule of the common law that nothing can be mortgaged that is not in existence, and does not at the time of the mortgage belong to the mortgagor.   *Tapfield* v. *Hillman*, 4 M. & G. 240 ; *Lunn* v. *Thurston*, 1 M., G. & S. 383 ; *Winslow* v. *Merchants' Ins. Co.*, 4 Met. 306 ; *Jones* v. *Richardson*, 10 Met. 488 ; *Moody* v. *Wright*, 13 Met. 17.

This rule, that a mortgage cannot cover future acquisitions, would seem to have been established on the technical ground that a mortgage is a sale upon condition, and by the common law there could be no sale of a thing not in *esse*, and not at the time the property of the seller.

By the civil law a mortgage may cover the future property of

the mortgagor. Domat., part 1, book 3, tit. 1, sec. 1, articles 5 and 7. And in some jurisdictions, where the maxims of the common law prevail, mortgages have been sustained covering the future and shifting stock of a trading or manufacturing establishment; as in the case of *Holly* v. *Brown*, 14 Conn. 255. So in *Abbott* v. *Goodwin*, 20 Maine 408, a mortgage of a stock in trade and of the substituted goods was held to be valid. And such a mortgage was sustained against an assignee in bankruptcy in *Mitchell* v. *Winslow*, 2 Story 630. In these cases, not merely the existing property, but also the business and establishment appear to have been regarded as the subjects of the mortgage ; and the mortgagor, while he remained in possession, was looked upon in the light of an agent for the mortgagee, so far as his interest was concerned, with an implied authority to buy and sell, and manage generally, according to the usual course of the business.

Even where the strict rule against the mortgaging of subsequently acquired property is enforced, if the mortgage purport to cover such property, and the mortgagee take possession, with assent of the mortgagor, before another title attaches, he will hold from time to time, not as mortgagee, but as pawnee, under the contract contained in the mortgage. *Rowley* v. *Rice*, 11 Met. 333. And in mortgages of real estate it is a familiar rule that buildings, and other things annexed to land after the mortgage, are regarded as accessions to the original subject of the mortgage, and covered by it. *Pettingill* v. *Evans*, 5 N. H. 54.

There is, therefore, no intrinsic difficulty in a mortgage which should cover the future and shifting stock and property of a trading or manufacturing establishment, or of a corporation. But by the common law, according to the weight of authority in other jurisdictions, and as we understand the rule to be in this State, no mortgage can be made to cover any personal property, except specific articles belonging to the mortgagor at the time of the mortgage ; and, unaided by the special act of the Legislature, the railroad in this case would have no power to make a mortgage that should have the effect contended for by the bondholders. The question whether the trustees can hold subse-

quently acquired property against the claim of the complainants, will, therefore, depend on the construction of that act and of the mortgage deed made under it. Did the act authorize the road to make a mortgage which should cover property of the road afterwards acquired ? and if so, did the directors make such a mortgage in this instance ?

The word " franchise," so often used in the act and in the deed, has various significations, both in a legal and popular sense. A corporation is itself a franchise belonging to the members of the corporation ; and a corporation, being itself a franchise, may hold other franchises, as rights and franchises of the corporation. A municipal corporation, for instance, may have the franchise of a market, or of a local court ; and the different powers of a private corporation, like the right to hold and dispose of property, are its franchises. In a more popular sense the political right of subjects and citizens are called franchises, like the electoral franchise. Com. Dig., Franchise, F, I. ; Angell & Ames on Corp. 3 ; *The King* v. *London,* Skinner 310, 311.

A corporation, being itself a franchise, consists and is made up of its rights and franchises ; and when all its franchises are gone, by surrender, by forfeiture judicially ascertained, by limitation of the grant, or in any other way, the corporation has no longer any practical existence. If the franchise or franchises are of a nature to continue after they are lost by the corporation, they may be regranted to another corporation, or to other individuals ; but the former corporation is substantially dissolved. 2 Kent's Com. 305, and note *a*, 308 and 309 ; *The King* v. *Pasmore,* 3 T. R. 199 ; *Com.* v. *Hancock Bridge,* 2 Gray 59, 60.

The grant of a corporation is a contract between the State granting it and the grantees. It is peculiarly and emphatically so in the case of railroad corporations, which are created upon public considerations, and clothed with extensive and extraordinary powers, for the purpose of enabling them to accomplish the public object contemplated in the grant. The members and

stockholders have private rights ; but the corporations are also bound to the discharge of their public duties, and cannot, without the aid of special legislation, disable themselves from performing their duty to the public by alienating or transferring their corporate rights and franchises. They may sell or mortgage their personal property, but they cannot sell or mortgage with it the right to manage and control the road, nor any other corporate right or franchise. *The King* v. *The Severn & Wye R. W. Co.*, 2 B. & Ald. 646 ; *Reg.* v. *The Eastern Counties R. W.*, 10 Adol. & Ellis 531 ; *Reg.* v. *South Wales R. W. Co.*, 14 Ad. & Ellis (N. S.) 902 ; *Clark* v. *Washington*, 12 Wheaton 46, 54 ; *Winchester & Lexington Turnpike R. Co.* v. *Vimont*, 5 B. Monroe 1 ; *Arthur* v. *The Commercial & R. R. Bank*, 9 S. & M. 394.

If this corporation had authority to make a mortgage that should convey the franchise and corporate rights, the power must be derived from the special act.

It is a very familiar rule in the interpretation of statutes that all parts of the act must be considered together, and such construction given to it as will best answer the intention of the makers. To accomplish this object, in some cases the letter of the statute may be restrained by an equitable construction ; in others, enlarged ; and sometimes the construction may be even contrary to the letter. *Holbrook* v. *Holbrook*, 1 Pick. 250 ; *Somerset* v. *Dighton*, 12 Mass. 384.

On examination of this act it will at once be seen that the several parts cannot all take effect in the sense that would most naturally belong to each, if they were considered separately.

In the third section the directors are authorized to mortgage " the whole or a part of the real or personal estate of said corporation." Stopping here, and taking this clause by itself, no inference can be drawn from it of an intention to give the power of mortgaging the franchises or future acquisitions and accessions of personal or real estate. This is the clause in which the authority to mortgage is directly conferred. If a more extensive power were intended to be given by the act, why is no mention made of it here ? The argument drawn from this part

of the act against the construction contended for by the bond-holders, goes upon the ground that this clause was intended to include and define all the powers of mortgaging conferred by the act.

But by the same section the trustees are authorized to sell, according to the conditions and limitations that may be contained in the mortgage deed, " the real and personal estate, and all rights, franchises, powers and privileges named in said mortgage deed." The directors therefore are authorized to *name* in the mortgage deed, not only the real and personal estate, but rights, franchises, powers and privileges of the corporation. The rights and franchises named in the deed are to be disposed of by sale, to enforce the mortgage security in the same way with the property mortgaged; and there is nothing from which it can be inferred that the rights and franchises, and the property of the corporation, are not to be named in the same way and conveyed in the same way by the deed; that is to say, the rights and franchises are to be conveyed and mortgaged like the property, and are to be disposed of under the mortgage for the same purpose, and in exactly the same manner. The directors may *name* in the mortgage—in other words, they may convey in mortgage—any part or all the real and personal property, and any or all the rights, franchises, powers and privileges of the corporation. The act sets no limit on their discretionary power in this respect; and whatever the directors *name* in the mortgage which they give in behalf of the road, is to be disposed of in the same way for the satisfaction of the mortgage debt, whether it be the property or the rights and franchises of the corporation. The power to mortgage the rights and franchises, as well as the property of the corporation, is plainly and necessarily implied from these provisions of the act.

The act, therefore, does not limit the power of mortgaging to real and personal property on hand at the time, but gives authority to mortgage the rights and franchises of the corporation, which could not be done without the aid of the act. And it cannot be maintained that the authority to mortgage real and

personal property given in one part of the act, was intended to be exclusive of all further power, when the further power of mortgaging the rights and franchises of the corporation is clearly given by necessary implication in another part of the same section.

The fourth section provides that the deed of the trustees shall convey to the purchasers " all the real and personal property named in said mortgage deed, together with all the rights, franchises, powers and privileges in relation to the same, which said corporation possessed at the time of the execution of the mortgage." If part only of the property belonging to the road had been mortgaged by a specific description, and the general right to the road had remained in the corporation, it is not easy to understand how there could have been any practical sale and transfer of the rights and franchises of the corporation in relation to the particular property mortgaged, which could have been beneficially exercised by the purchasers. And it will be seen that, by the subsequent provisions of the same section, the purchasers of the property mortgaged, whether less or more, are to have " all the rights, franchises, powers and privileges" of the corporation. The purchasers, by the deed of the trustees, whether the whole or part only of the property is mortgaged, " acquire all the rights, franchises, powers and privileges which said corporation possessed, and the use of said railroad, with all its property and rights of property, for the same purposes and to the same extent that said corporation could use the same if said deeds had not been made."

The directors, by the act, have power to mortgage the whole or any part of the property ; and if they should mortgage part only, it would seem to be implied in one clause that the partial mortgage would carry with it the rights and franchises of the corporation so far only as they were connected with the property specifically mortgaged. It is manifest that there would be an intrinsic difficulty in carrying into practical effect such a construction of the statute. How could the rights and franchises of the corporation be divided so that the purchasers of part of the prop-

erty should have and exercise their proportionate share of the franchises ? And the act evidently contemplates no such division and apportionment ; for the provision depriving the effect and operation of the trustees' deed is general, that when the property mortgaged, whether more or less, is sold, the purchasers shall take " *all* the rights, franchises, powers and privileges" of the corporation. The act does not authorize a sale of the property mortgaged separate from the rights and franchises, nor a sale of any thing short of all the rights and franchises of the corporation. The rights and franchises are not to be divided and apportioned on a sale by the trustees, nor separated from the property mortgaged.

There is a manifest want of accuracy and clearness in this, as in other parts of the act, which ought not, perhaps, to surprise us in a subject so intricate and so new to legislation. Probably the framers of the law were too well acquainted with the condition and prospects of the road to expect that a loan could be effected on the security of a mortgage, unless it were general, and covered the whole road, with all its property ; and in the provision for a sale by the trustees they may well be supposed to have overlooked the possible case of a mortgage conveying a part only of the property belonging to the road.

The directors then had power under the act to name in their mortgage, and to convey in mortgage to trustees, all the property, and all the rights, franchises, powers and privileges of the corporation. If they made such a mortgage it would convey to the mortgagees all the right and power which the corporation had to acquire and hold property, for the power to acquire and hold property is one of the rights and franchises of the corporation. That right would be conveyed and transferred from the road to the trustees by the mortgage deed, in the same way that the property was conveyed and transferred, subject to the condition of the mortgage ; and the subsequently acquired property would pass under the mortgage as incident to the right of acquiring and holding it, which would be vested in the trustees by the mortgage.

The purchasers under the deed of the trustees " acquire all the rights, franchises, powers and privileges which said corporation possessed, and the use of said railroad, with all its property and rights of property, for the same purposes and to the same extent that said corporation could use the same, if said deeds had not been made, subject to the same liabilities as to the use of said railroad that said corporation would be under if said deed had not been made." All this the purchasers take through a sale authorized to enforce the mortgage security ; and we cannot understand that anything different from this, or less than this, was authorized to be mortgaged and covered by the mortgage for the security of the mortgage debts. It is contrary to all the received notions of a mortgage that anything should be sold under it to pay the debts secured, that was not mortgaged and covered by it before the sale.

It would seem to be the plain intention of the act to preserve the corporate rights and franchises, and maintain the corporate liabilities in the hands of the purchasers at the trustees' sale. All the rights and franchises of the corporation, and the use of the road, are transferred to them by the deed of the trustees, and they hold the corporate rights and franchises, subject to the same liabilities as to the use of the road by which the corporation was bound before the sale. They have all the property and all the rights and franchises, and are likewise bound to perform all the public duties of the corporation. It is not easy to see how the original corporation, in the hands of the former corporators, could, after such a sale, have any practical or even legal and theoretical existence. They could hold no property ; they could maintain no action, nor elect any corporate officer ; these powers are all rights and franchises of the corporation, created and granted by the act of incorporation, and are all transferred and conveyed by the deed of the trustees to the purchasers under their sale. In some cases, after the franchises of a corporation are lost by forfeiture, the corporation is still held to exist in contemplation of law, so far as to be capable of being revived by a regrant from the government. But here the franchises would

not be forfeited to the State, but transferred to the purchasers ; and the State could not revive the old corporation by a re-grant of the franchises, which had become vested in the pur-chasers. The sale would in substance transfer the road and the corporation to the purchasers.

There may be a difficulty, which it is not necessary to antici-pate, in saying how the purchasers shall exercise some of these rights. There is no provision in the act for their doing it through the machinery of the old corporation. They may, perhaps, be regarded somewhat in the light of new grantees of the old fran-chises.

If, then, the purchasers under the trustees' sale take what was originally mortgaged, and take all the property, rights and franchises of the corporation, to hold and enjoy as the cor-poration held and enjoyed them, they take substantially the cor-poration itself; and the corporation itself was the thing origi-nally mortgaged.

In the fifth section the act gives the directors power, notwith-standing the mortgages, before possession is taken by the trus-tees, to " sell and dispose of any of the personal property of said corporation." This provision applies in terms to all personal property of the corporation, without distinguishing between prop-erty on hand at the time of the mortgage, and property acquired afterwards ; and standing alone might imply that without the authority of this provision the directors would have no power to sell any personal property of the corporation, whether acquired before or after the mortgage. But under a proviso in the same section it is made the duty of the directors, with the pro-ceeds of the property sold by them, to purchase other property equal in amount, and " which shall be holden by said trustees under said mortgage, in the same manner as if the same had been owned by said corporation at the time of the execution thereof, and included specifically in said mortgage deed."

From this last provision it is argued that no property acquired after the mortgage was intended to be covered by it, except such as was specifically substituted for particular articles included in

the mortgage and sold afterwards by the directors; for if all property acquired by the mortgage were subject to it, this provision, it is said, would be idle and unnecessary. But it is to be observed that the act gave the directors power, if they should see fit, to make a partial mortgage to the trustees of the personal property belonging to the road; and if such a mortgage had been made the directors could not have sold any of the specific articles mortgaged without this provision. And the argument is equally strong to show that the directors would have no authority under the act to mortgage, unless the particular articles of personal property were specifically described in the mortgage, for the trustees are to hold the substituted property in the same manner as if it were owned by the corporation at the time of the mortgage, " and *specifically described* in the mortgage." There is, in fact, no description of any specific property in the mortgage to the trustees, and the argument from this clause, if it would avail for anything, would make the whole mortgage void, certainly so far as relates to the personal property.

This proviso has much the appearance of having been patched into the act after the original draft, and is very likely to have been adopted without very carefully considering its meaning and effect; and, at most, lays the foundation for a loose inference of a negative from an affirmative proposition. The proviso declares that certain property acquired after the mortgage *shall* be covered by it; but does not provide in direct terms, nor by any necessary implication, that other property acquired afterwards shall *not* be subject to the mortgage.

Power to sell, notwithstanding the mortgage, in the manner necessary for the profitable and convenient management of such a business, would probably be implied without express authority given in the act. The directors and the corporation could retain the charge and management of the road until the conditions of the mortgage were broken, which might be for twenty years. They would act, so far as the mortgage was concerned, in the character of trustees or agents, with an implied authority to conduct the business of the road in a proper and judicious manner

for the benefit of all concerned, as the mortgagor of a trading or manufacturing establishment does, where such mortgages are allowed; and this would necessarily imply power to buy and sell in the usual course of such a business. And the power to sell in the usual course of the business would be widely different from the power to mortgage for the security of debts. Selling in such case would be allowed for the benefit of the business and of the mortgage security; the property sold would disappear from the road; and in order to keep the road in operation the directors would be obliged to purchase other property to supply its place. This, it is quite apparent, would be altogether a different thing from the power to mortgage the property of the corporation for debts, new and old, and retain possession of it to continue the operations of the road.

An analysis of the act and an examination of the several parts, when taken together and compared with each other, lead to the conclusion that the Legislature intended to grant the power of mortgaging all the property and all the rights and franchises of the corporation, including the right to property subsequently acquired. We have not been able to discover anything in the act which directly contradicts, or by any necessary implication excludes this construction. There are express grants of particular powers in different parts of the act, from which the argument is drawn, that nothing more than is there expressed was intended to be granted elsewhere. For instance, in one clause authority is given to mortgage all or part of the real or personal property of the road. But it is quite plain from other provisions that this was not intended to be the limit of the authority conferred. The provisions for the sale and transfer to the purchasers under the mortgage of all the rights and franchises are practically inconsistent with such a narrowed construction of the act. The material and substantial provisions of the act cannot be carried into effect without construing it to give the power of mortgaging the road, and all its rights and franchises, as an entire thing, and subsequently acquired property, as an incident to the general subject of the mortgage, and an accession to it.

The general design and object of the act favor the same construction. The corporation already had power under the general law to mortgage their property then in possession, and for that purpose had no need of special legislation. The act must have intended to enlarge that power, and authorize the road to make a mortgage substantially different from such as are allowed at common law ; and that intention would not be answered if the act should be so construed as to limit the power of mortgaging to property then owned by the road. The act is entitled " An act to aid in the construction of the Portsmouth and Concord Railroad." The road was unfinished, and the money borrowed on the security of the mortgage was to go into the road, to assist in the enterprise and undertaking. The statements of the bill show that at the time when the mortgage to the trustees was made, all the personal property of the road had been already mortgaged to these complainants for the security of other debts. There is nothing in the case which furnishes any ground to infer that the road had then any unincumbered property capable of being mortgaged. If so, and the mortgage to the trustees could attach on nothing but property then belonging to the road, all that the bond-holders would have under their mortgage for security of their demands would be a right in equity to redeem property of the road already mortgaged for other debts. This, we think, is not the security upon which the bond-holders supposed they were lending their money, nor the security which the Legislature intended to give them by the act. The general design must have been to give those who advanced money to complete the road on credit of the mortgage specially authorized by the act, a substantial and available security, and a preference over other subsequent creditors.

But if all subsequently acquired property might be mortgaged to secure other debts, new and old, and those mortgages were upheld against the bond-holders, money might be obtained on such security to carry on the road, to pay interest on the bonds, or even to pay dividends, and when possession should be taken for the bond-holders, perhaps at the end of ten or twenty years,

they might have little for their security but the franchise and road-bed ; for much of the iron and other materials since affixed to the road are covered in terms by the complainants' mortgages, and claimed under them. If other creditors of the road had stood on such terms with the directors and managers as would enable them to obtain mortgages of the newly acquired property, as it fell from time to time into the hands of the corporation, the bond-holders, instead of having a preference, would have been the last creditors likely to realize anything from their security, in case the road should turn out to be insolvent.

The object of the act being to give the bond-holders a substantial and available security for their money, and a preference over other creditors not previously secured, can only be answered by so construing the law as to give the bond-holders security upon the road itself, as the general subject matter of their mortgage, and upon the changing and shifting property of the road as part and parcel, by accession, of the thing mortgaged.

The question is certainly not free from difficulty ; but whether we look to the particular provisions, or follow what we must understand to have been the general object and design of the law, we are on the whole brought to the conclusion that it authorized the directors to mortgage, not only the property then belonging to the road, but all the franchises and rights of the corporation, and, in substance, the road and corporation itself. That if the directors made such a mortgage, as incident to the franchise and corporate rights mortgaged, subsequently acquired property, immediately upon its vesting in the corporation, would, as an incident and by accession, become part of the thing originally mortgaged, and of the mortgage security. The right to take and hold property being one of the franchises mortgaged, the corporation would have no power to take or hold property, except by virtue of that franchise and under the mortgage by which the franchise was covered.

We are of opinion, then, that the act authorized the corporation to mortgage the whole road as an entire thing, with all its corporate rights and franchises, and incidentally, and by way of

accession, all the subsequently acquired property of the road. Did the directors in fact make such a mortgage ?

The deed recites that the directors, in pursuance of the act and of the vote of the stockholders, had appointed the trustees " to take and hold security on all the property of said company, and all its rights, franchises, powers and privileges, in mortgage and in trust," and then the Portsmouth and Concord Railroad " give, grant, sell, convey and mortgage" to the trustees " the railroad of said corporation, together with all its rights, franchises, powers and privileges in the towns, &c., as it is now constructed and improved—with all the lands, buildings and fixtures thereto belonging, and which may hereafter thereto belong, with all the rights, franchises, powers and privileges now belonging to, or held, or which may hereafter belong to or be held by said corporation, together with the locomotive engines, &c., and all the other personal property of said corporation, as the same is now in use, or may hereafter be changed and renewed by said corporation ; to have and to hold the said railroad franchise and estates aforesaid, whether real or personal, with all the privileges and appurtenances, legislative grants, powers, rights and privileges, now or hereafter granted, thereto belonging."

The deed conveys the railroad and the franchises and rights of the corporation, as well as the property, and it takes effect immediately upon all. The deed in terms conveys lands subsequently acquired, and personal property as then in use, and as it should thereafter be changed and renewed.

The last clause, if other parts of the act and deed required it, might be limited in construction to the case where specific property mortgaged was sold and other property substituted in its place ; but the broader meaning is at least as natural, that all the shifting and changing personal property of the road should be covered by the mortgage, and has the advantage of agreeing with the provision of the deed that lands subsequently acquired should be held under the mortgage, and with the necessary inference, drawn from the mortgage, of the rights and franchises of the corporation. And then under the mort-

gage deed the trustees are empowered to take possession of the *road*, and sell the *same*, and their deed passes to the purchasers, not the property owned by the road at the time of the mortgage, but " all the property, real, personal and mixed, rights, powers, franchises and privileges of this corporation."

Taking the whole deed together the intention is very apparent to mortgage, not merely property then belonging to the road, but the road itself and all its franchises, as one entire thing, and, as an incident and accession, all property of the corporation afterwards acquired. And such we think was' the legal operation of the deed under the act.

We have met with but few authorities that bear directly on this question, and in forming our opinion have been obliged to rely mainly on the application of general principles. The case, however, of *Willink* v. *The Morris Canal & Banking Co.*, 3 Green Ch. 377, cited and relied on by the counsel for the bond-holders, though not like this in all its circumstances, is strongly in point. In that case the Legislature of New-Jersey passed an act authorizing the corporation " to hypothecate, by way of trust mortgage, or otherwise, the Morris Canal, with all its privileges, appendages and appurtenances, and all the property and chartered rights of said canal." To secure payment of a loan, the corporation made a mortgage to trustees " upon all and singular the Morris Canal, with all the privileges and appurtenances thereto belonging," describing particularly the parts and appurtenances of the canal. Neither the act of the Legislature, nor the mortgage made under it, provided in terms that lands or other property of the canal subsequently acquired should be held under the mortgage. The court held that the mortgage covered the entire canal, and real estate subsequently acquired. We are unable to see, if land and real estate, acquired after the mortgage, passed under it as incident to the conveyance of the canal and its rights and franchises, why, upon the same ground, the personal estate should not take the same course. The principle of *Willink* v. *The Morris Canal* goes far to cover the whole ground of the present case.

The bill states that a large sum has been expended since the mortgage to the trustees, beyond the amount realized on the bonds, in adding to the value of the road; and that the property mortgaged to Haven and Pierce, except the iron, was paid for by money lent to the road by the complainants and others named in the several mortgages.

But we do not see how any equity can be founded on these statements, which could affect our decision. There is no statement that the bond-holders have sufficient security without coming on the property mortgaged to the complainants. The bill concedes that the bond-holders are *bona fide* creditors for money lent under the act. All the parties that claim security on this property are meritorious creditors, and ought to be fully paid, if the road has means; and if the road is insolvent and able to pay but part, the only question that can be entertained on this bill is, which of the parties has secured the legal preference.

The case of the iron imported in the ship General Berry requires a separate consideration. The iron belonged to the railroad, subject to the lien of the United States for duties; and the mortgage to the trustees, upon the principle which we have stated, would cover the iron, subject to that lien; and the mortgage subsequently made to the complainants, so far as it went to secure other debts besides the sum afterwards advanced to discharge the lien, must be postponed to the claim of the bond-holders. The interest of the United States in the iron consisted in the right to retain it till the duties should be paid. If the government voluntarily gave up possession, the lien would be gone, at least as to third persons.

On the 26th of June, 1851, when the complainants took their mortgage, the iron was subject, in the first place, to the lien for duties, amounting, as I understand it, to $4,399.85, and also to the mortgage previously made for security of the bond-holders. If there had been an agreement between the road and Pierce and Haven that they should pay the duties, receive the iron, and retain possession till the money advanced was repaid to them by the road, perhaps their lien, while they

retained possession, would be good against the trustees and their mortgage; because their mortgage would give them no more than the road had, which was a right to the iron, subject to the lien for duties; but the interest of the United States in the iron would be lost when they parted with possession, and they could transfer no higher right to the complainants; and when they, pursuant to the agreement contained in their mortgage, allowed the iron to go into the possession and control of the general owners, and to be applied to their use, the lien, as to the trustees and bond-holders, was gone. The claim of the plaintiffs on the iron cannot, we think, be maintained on the ground that the lien of the government was transferred to them on payment of the duties, and retained by them under their agreement with the road, because, on well established principles, when they voluntarily parted with possession the lien was gone.

When the iron was mortgaged to the complainants, it was subject to the prior mortgage of the trustees, and all that the road had was an equity of redemption subject to that mortgage. The railroad had nothing that they could convey or deal with in any way, except that equity. And they could make no bargain respecting the iron that would bind the trustees without their assent.

The bargain that the road might take the iron and lay it in the track, and the complainants have a right to take it up and remove it if the money advanced for the duties was not repaid within the time limited, though it would create no lien on the iron, as against third persons, who had not received notice and did not assent, would be a good and binding contract between the parties; and if the trustees had notice of the agreement and assented to it, we are of opinion that it would bind them and the bond-holders. *Le Gard* v. *Hodges*, 1 Vesey, Jr., 477; *Lyde* v. *Mynn*, 1 Milne and K. 683.

Notice to trustees, who take a conveyance for the mere purpose of upholding an estate, without having any previous connection with the title, is not always nor perhaps usually regarded as notice to the *cestuis que* trust. But the trustees under this act must be considered in the light of agents for the negotiating

the loan ; they act for those who lend their money on the security of the mortgage ; they are charged with the duty of protecting the interests of the bond-holders, who are unconnected individuals, having no ready means of acting together except through the trustees, whom the law appoints to act for them. Notice to the trustees would be all that could be given in this case.

If the bill had stated that the trustees knew of this agreement and assented to it, the complainants would have had a claim which would be .recognized in equity; but the bill contains no such statement. If the plaintiffs are advised that the trustees knew of the agreement, and assented to it, the bill may be so amended as to show that state of facts. The mortgage, however, and registration, would not be constructive notice of the agreement inserted in it. And perhaps the trustees would not be bound by the mere fact of notice as such. But if they all knew of the agreement, and their assent can be proved as matter of fact, by direct evidence, or by inference from notice and other circumstances, we think the contract would bind them and the bond-holders.

The demurrer must be overruled, as it is taken to the whole bill, and the complainants are entitled to part of the relief for which they pray. The demurrer may, however, be amended so as to apply to part only of the bill, and the defendants answer to the residue.